VICTOR A. MILLER AND BEATRICE A. MILLER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67114. Filed July 27, 1959.

*Horace N. Hawkins, Jr., Esq.*, for the petitioners.
*William E. McCormick, Esq.*, for the respondent.

FISHER, *Judge:* This proceeding involves deficiencies in income tax determined against petitioners as follows:

| Year | Amount |
|---|---|
| 1953 | $297.70 |
| 1954 | 2,584.48 |

In conformity with section 6214, Code of 1954, respondent filed an amended answer at the hearing claiming an increased deficiency in the amount of $300.90 for the taxable year 1953, or a total deficiency for said year in the amount of $598.60.

The principal issues presented for our decision herein are (1) whether a taxpayer who has elected to take the standard deduction on his own return may also get the benefit of a deduction for real estate taxes which he, in practical effect, paid individually, out of his own funds, on investment property titled in the name of a partnership; (2) whether the purchase by a partnership of the interest of one of four partners in certain notes and securities of the partnership gave rise to a stepped-up basis to the remaining partners with respect to their interests as partners in the notes and securities so purchased; (3) determination of basis of certain maturing notes; and (4) whether said notes were in registered form within the meaning of sections 117(f) and 1232(a)(1) of the Codes of 1939 and 1954, respectively.

### FINDINGS OF FACT.

Some of the facts are stipulated, and, as stipulated, are incorporated herein by reference.

Victor A. and Beatrice A. Miller, husband and wife (hereinafter called petitioners), are residents of Denver, Colorado. Petitioners filed joint income tax returns for the taxable years 1953 and 1954 with the director of internal revenue for the district of Colorado. For convenience, Victor A. Miller will be referred to hereinafter as petitioner.

Immediately prior to May 29, 1951, the A. S. Miller Estate was a partnership. The proportionate interests of the several partners were as follows:

| | Per cent |
|---|---|
| Victor A. Miller | 42 |
| Emma Miller "B" Trust | 22 |
| Emma Miller "C" Trust | 22 |
| Marcella M. duPont | 14 |

The B and C Trusts, mentioned hereinabove, were trusts created by Emma Miller, widow of A. S. Miller and mother of petitioner. Petitioner, in the case of the B Trust, and Marcella M. duPont, in the case of the C Trust, were the life beneficiaries. Petitioner was designated trustee of both trusts. Marcella is petitioner's sister.

Assets owned or held by the partnership and their respective adjusted bases in the hands of the partnership immediately prior to May 29, 1951, were as follows:

| | |
|---|---|
| Cash | $74,750 |
| 851 Clarkson St | 6,300 |
| Bonnie notes | 13,500 |
| Toltec stock | 14,800 |
| Toltec bonds | 9,200 |
| Miller-duPont, Inc., stock | 7,000 |
| Primrose refunding bonds | 5,100 |
| Cooper purchase bonds | 12,000 |
| Darlington stock | 9,000 |
| Darlington bonds | 11,300 |

(NOTE.—The items material to the instant case referred to as bonds were, in fact, notes.)

Income was derived from the aforesaid securities and from the management of real estate (apartment house and office buildings) owned by the same corporations which issued the securities. Petitioner was the partner who performed the management services.

On May 29, 1951, the partnership bought from Marcella her individual partnership share in the aforesaid securities and properties, other than the realty located at 851 Clarkson Street, for a consideration of $70,000, paid to her by a certified check drawn on the account of the partnership. By the written agreement relating to said purchase, her individual interest in the realty located at 851 Clarkson Street was expressly not affected.

A short time thereafter (some 3 days to 3 weeks), notes and securities owned by the partnership were distributed in kind to the B and C Trusts to the extent of their respective interests therein as partners (and other than their interest in 851 Clarkson Street) as follows:

### B TRUST

20 shares Darlington stock.
Darlington bonds (face value $59,300).

### C TRUST

Toltec bonds (face value $25,000).
Primrose refunding notes (face value $34,100).
Cooper purchase notes (face value $40,900).

Marcella M. duPont (who had received $70,000 for her interest in the notes and securities of the partnership) continued as a partner and retained her interest as a partner in 851 Clarkson Street. No distribution in kind of notes or securities was made to Victor A. Miller. The undistributed stocks, bonds, notes, and cash, together with his interest as a partner in 851 Clarkson Street, were considered as representing his partnership interest.

After May 29, 1951, petitioner continued to manage the same realty which he had previously managed for the partnership. During the taxable years 1953 and 1954, petitioner, individually, was entitled to receive all of the management fees.

The partnership real estate located at 851 Clarkson Street, Denver, was not productive of income at any time relevant to this case. After the aforesaid distribution to the trusts, the income from securities which had not been distributed to the trusts and the income from the management of the apartment and building corporations continued to come in almost entirely by checks payable to "A. S. Miller Estate," or "A. S. Miller Estate Partnership." These checks were customarily deposited in a bank account designated "A. S. Miller Estate," being the same bank account utilized by the partnership prior to the distribution of partnership assets. Receipts from management fees came in similarly and were handled in the same manner by petitioner.

Not all funds received and placed in the bank account of "A. S. Miller Estate" were remitted to petitioner. In some cases, funds, including some of the funds originating from the maturity payments of the Cooper purchase notes and the Primrose refunding notes in 1954, were left in said bank account. In some instances, checks were drawn against said bank account for real estate taxes on the 851 Clarkson Street property (see *infra*) and for other disbursements for the preservation of said realty.

The office door carried the name and style "A. S. Miller Estate," and all cards, stationery, rental contracts, notices, discounts, accounts and account books, and the like, bore the same style and title before and after the transactions of May 29, 1951. Likewise, the undistributed notes and securities remained in the name of the "A. S. Miller Estate" and were kept in the safe-deposit box of the "A. S. Miller Estate" until their registry in early 1952, to be discussed *infra*, after which they were retained in a file in the office marked "A. S. Miller Estate."

After distributions of the aforesaid securities in May 1951, the partnership real estate remained in the record title of "A. S. Miller Estate Partnership."

After May 29, 1951, real estate taxes on 851 Clarkson Street continued to be assessed in the name of "A. S. Miller Estate Partnership," and tax bills were sent to the same addressee. Said property taxes were paid each year by checks drawn on the bank account of "A. S. Miller Estate," and tax receipts were issued to the payor in the same style. The funds out of which such taxes were paid were, in fact, funds belonging to petitioner.

During the taxable years 1953 and 1954, interest income in the amounts of $91 and $216, respectively, from certain of the securities not distributed to the trusts was paid into the partnership and was reported in the respective returns filed by the partnership for the years in question.

Certain notes here involved matured and were paid as follows:

|  | 1952 | 1953 | 1954 |
|---|---|---|---|
| Primrose refunding notes | $2,500 | ------ | $5,000 |
| Cooper purchase notes | 2,500 | $2,500 | 2,500 |

During the taxable years 1953 and 1954, partnership income tax returns were filed in the name of "A. S. Miller Estate (Liquidating)." The returns were signed by Victor A. Miller. Income received in 1953 and 1954 in the form of management fees and interest on undistributed notes and securities was reported in the partnership returns for the respective years. Such income, in fact, belonged to petitioner.

The partnership, in its returns for the taxable years 1953 and 1954, took deductions in the respective amounts of $452.32 and $449.85, representing the payment of real estate property taxes on 851 Clark-

son Street. The source of funds for payment of said taxes was either the management fees or interest reported on the partnership returns or the maturity payments which were received on the Primrose refunding and Cooper purchase notes. Petitioner, individually, was entitled to such funds.

The partnership returns for the years 1953 and 1954 showed the entire net income to be distributable to petitioner. The income reported as distributable was included in the joint income tax returns of petitioners for the same respective years.

Petitioners claimed the standard deduction in their 1953 and 1954 joint income tax returns.

The real property located at 851 Clarkson Street, Denver, Colorado, also referred to as the "old family home," at one time had been the residence of petitioner's father and mother. The property was in excess of 5 city lots. The father died in 1919 and the mother died in 1943, leaving said property to a daughter, Helen Ellwood Stokes. At the time of the mother's demise, each of the members of the A. S. Miller family had a home of his or her own. Petitioner owned a home at 485 Williams Street. After receiving the property, Stokes was anxious to sell it and placed it in the hands of a real estate agent for sale. A. S. Miller Estate Partnership agreed to purchase the realty from Stokes for $11,000, and in 1944 gave her a check drawn on the partnership account in that amount. On June 6, 1944, the property was deeded to "A. S. Miller Estate Partnership."

During 1944, the year the property was acquired, petitioner made arrangements to occupy "851" as his personal residence upon his release by the Armed Forces. His primary purpose in doing so was to enable him to superintend and fix up the house to make the property more salable. Petitioner accordingly sold his own house at 485 Williams Street and moved his family into 851 Clarkson Street, where he continued to live until the date of trial.

During all periods here material, "851" was titled in the name of A. S. Miller Estate Partnership.

In January 1945, after said realty had been repaired, petitioner made an effort to rent it furnished or to sell it by placing a number of advertisements in the local newspaper. A number of inquiries relating to the property were addressed to petitioner (Box 2X–98, Post, Denver, Colorado), but it was decided not to sell or rent the house at that time. Said real estate has not been productive of income at any time relevant to the instant proceeding.

On April 1, 1952, the board of directors of Miller-duPont, Inc., of which petitioner was then president, held a meeting at which certain bearer notes designated "Primrose, Inc., Refunding Notes," and "Cooper Purchase Notes," issued by Miller-duPont, Inc., were discussed. Thereupon, at said meeting of April 1, 1952, the board of

directors of Miller-duPont, Inc., authorized the registration of said notes, provided for listing of the owners thereof in the regular books of the corporation, and further provided that on presentation the notes were to be stamped or otherwise marked "registered" above or before the word "bearer."

On or about April 1, 1952, certain of the Primrose refunding and Cooper purchase notes, including the two Primrose refunding notes paid in 1954 and the Cooper purchase notes paid in 1953 and 1954, involved herein, were presented to Cleon O. Anderson, secretary-treasurer of Miller-duPont, Inc., and she stamped the word "registered" thereon above the word "bearer" so that a typical note involved herein read as follows:

PRIMROSE, INC., REFUNDING NOTES

| $1600.00 | April 1, 1946 |
|---|---|

On April 1, 1954 after date we promise to pay to the order of

(REGISTERED)<br>Bearer

| Sixteen hundred and no/100ths | Dollars |
|---|---|

Payable at our office

Value received with interest at the rate of one (1) per cent per annum payable annually on April 1.

MILLER-DUPONT, INC.

No. A    1954 Due April 1, 1954

By (Signed)   Victor A. Miller
*President.*

The notes contain no other references to registration.

At or about the same time, said secretary-treasurer of the company placed in the record book of the company, at the place where the accounting of the payments upon the said notes were recorded, a paper stating as follows:

Accounting Note:

Of the purchase money issue, bond 1956 B and both A and B series 1957 to 1972 inclusive belong to the Emma Miller "C" trust, aggregate $40,900.00. There remains to A. S. Miller Estate (VAM) bonds 1952 to 1955 A and B and A of 1956, five bonds aggregate $11,600.00. Of the Primrose Refunding issue both A and B series 1956 to 1968 inclusive and 1969 of the A series belong to the Emma Miller trust, total value $34,100.00.

This leaves both A and B series 1952 to 1955 inclusive, aggregate $10,000.00 to A.S.M.-V.A.M.

This does not give effect to Jan. 1, 1952 transactions.

Interest payable VAM 1/1/52 is 1% on $11,600.00 plus ¼ of 1% on $52,500.00, total $247.25.

In a previous tax case scheduled to be heard in 1956 (Victor A. Miller and Beatrice A. Miller, Denver, Colorado, Tax Court Docket No. 52461), petitioner submitted a "collateral agreement," fixing the original bases of the Primrose refunding notes and Cooper purchase notes, which reads:

As further consideration for acceptance by the Commissioner of Internal Revenue of a proposal for settlement of the above-entitled case pursuant to a stipulation of deficiency, duly executed and submitted, the undersigned, individually and as a partner of A. S. Miller Partnership (new), hereby agrees:

That the bases of The Primrose, Inc. stock and notes on acquisition in August 1945 was $7,000.00 and $21,000.00, respectively, and

That the basis of Cooper Purchase Notes upon acquisition in February 1946 was $39,500.00.

It is further agreed that upon recovery of the bases of notes set forth above, or any addition thereto properly arising by force of subsequent transactions, any further receipts on said notes constitutes ordinary income and will be so accounted for providing that the provisions of Sec. 117(f) of the 1939 Code or similar provision of subsequent law is not applicable.

/s/   Victor A. Miller
VICTOR A. MILLER
Individually and as a Partner
A. S. Miller Estate Partnership (new).

OPINION.

**I.** *Effect of Election on Petitioner's Return to Take Standard Deduction on His Right to the Benefit of a Deduction for Real Estate Taxes Paid by Petitioner on Investment Property of Partnership.*

The first issue relates to the effect of petitioner's election to take the standard deduction on his right to the benefit of a deduction for real estate taxes on the property, 851 Clarkson Street, for 1953 and 1954.

Much of the discussion in the briefs revolves around the question of who, or what entity, owned "851."

Petitioner maintains that "851" was owned in the years in question (a) by A. S. Miller Estate Partnership (admittedly a partnership at least until May 29, 1951); or, in the alternative, (b) if dissolved on or about May 29, 1951, by the same partnership in liquidation, since it was not terminated at least until after 1954; or (c) by a new partnership or joint venture of the same partners having its inception on or about May 29, 1951, and continuing at least until after 1954.

Respondent maintains that A. S. Miller Estate Partnership was both dissolved and terminated on or about May 29, 1951, or at least prior to 1953, and that "851" was thereafter owned by the former partners as tenants in common.

We take the view that the partnership owned "851" during the years in question, but we find it unnecessary to decide this question in relation to the issue now under consideration since we have concluded that petitioner is not entitled to deduct the taxes in question whether the partnership owned the property or not. In our discussion we assume, *arguendo*, that the partnership owned the property since

this is the most favorable approach which we can take from petitioner's standpoint.

During the taxable years 1953 and 1954, real estate taxes in the respective amounts of $452.32 and $449.85 assessed against 851 Clarkson Street were deducted on the partnership return as a deduction in computing its net income. The taxes were paid out of funds nominally in the partnership bank account, but we think it clear on the record that the funds in question belonged to petitioner and not to the partnership. Petitioner, on his own (joint) returns for 1953 and 1954, included as his distributable share of the partnership net income the full amount thereof as reported by the partnership on its return which amount reflected the deduction for payment of real estate taxes as above set forth, and, in 1953, an item of interest not involved in the issue under discussion. For the same years, petitioner also elected to take the standard deduction on his (joint) income tax returns.

Respondent contends that petitioner cannot deduct, in 1953 and 1954, in addition to the standard deduction, any taxes or other deductions which were not deductible in determining petitioner's adjusted gross income. See secs. 23(aa)(2) and 63(b) of the Codes of 1939 and 1954, respectively. We think this view is correct, assuming, as we have found, that the taxes were paid out of funds belonging to petitioner and not to the partnership. Petitioner, as managing partner, had control of the so-called partnership funds. The property was not producing any income. The funds included in the partnership bank account used to pay the taxes in question arose from income to which petitioner alone was entitled. Petitioner individually had a substantial interest in the property (42 per cent) although it was titled in the partnership name, and petitioner had a prospective interest (22 per cent) in any gain from subsequent sale (or rental) of the property. Respondent argues, and we think correctly, that as a practical matter petitioner paid the taxes himself as an individual, and, as a corollary, that in view of the fact that petitioner elected to take the standard deduction, he cannot also deduct the taxes which were a nonbusiness expense since, taking the view most favorable to petitioner, the property was held primarily as a long-term investment. See secs. 23(aa)(2) and 63(b) of the Codes of 1939 and 1954, respectively.

We hold, therefore, that respondent correctly determined that the taxes in question are not allowable as a deduction to petitioner.

## II. Basis of Securities.

On May 29, 1951, the partnership bought from Marcella M. duPont, one of the partners, her partnership share in securities owned by the partnership for $70,000. She retained her partner's share in 851

Clarkson Street. Shortly thereafter, the partnership distributed to the B and C Trusts (which were partners) their proportionate interest in the partnership securities. The trusts likewise retained their partner's share in "851." The interest of petitioner, as partner, in the remaining securities of the partnership, which comprised all of said remaining securities, was not distributed to him. He also retained his partner's interest in "851." The management services continued as before, and were rendered by petitioner who, at least as a practical matter, was entitled to the benefit of such income as was derived therefrom during any period here relevant.

Petitioner urges that the basis of the securities of the partnership must be stepped up and allocated to reflect the $70,000 paid to Marcella for the purpose of determining the gain on certain of such securities (referred to *infra*) which matured during periods and in amounts here relevant. Petitioner relies upon section 113(a)(13) of the Code of 1939.[1]

We think it is clear that petitioner is not entitled to a stepped-up basis or any allocation thereof because the partnership did not acquire any assets in the transaction with Marcella which it did not already own. It is our view that the principles announced in *Robert E. Ford*, 6 T.C. 499 (1946), are here controlling. In that case we said, in part (p. 501):

In the instant case four of the partners purchased the interest in the partnership from the other partner. The partnership, as such, engaged in no transaction affecting it as a computing unit. It continued after the withdrawal of the partner in the same business, under the same name, without interruption, as agreed. Realistically speaking, the only change that has taken place is that the remaining partners have acquired a greater interest in the profits and surplus when final liquidation occurs. After that transaction occurred, the partnership had the same identical assets as before. The partnership as a computing unit had neither disposed of any of its old assets nor acquired any new assets. Hence, there exists no logical reason for disturbing the cost basis to the partnership of specific partnership assets. * * *

At page 502, we added the following:

The respondent has allowed two-thirds of the original cost, plus one-third of the fair market value of the securities sold as of November 26, 1938, when the retiring partner sold her interest, as the cost basis to the remaining partners.

---

[1] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(13) PARTNERSHIP.—If the property was acquired, after February 28, 1913, by a partnership and the basis is not otherwise determined under any other paragraph of this subsection, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. If the property was distributed in kind by a partnership to any partner, the basis of such property in the hands of the partner shall be such part of the basis in his hands of his partnership interest as is properly allocable to such property.

We think he erred. Since there was no dissolution or termination of the partnership in fact or by operation of law, we conclude that with respect to those securities sold by the partnership the original cost basis to the partnership of such securities is the proper cost basis for determining gain or loss to the partnership and the individual partners, petitioners herein. * * *

See also *Anderson* v. *United States*, 232 F. 2d 794 (C.A. 9, 1956).

In the light of the foregoing, we hold that petitioner is not entitled to a stepped-up basis in respect of the securities in question.

We next turn to the details of the determination of basis insofar as here involved.

Petitioner received maturity payments on the Primrose refunding notes in the amount of $2,500 in 1952 and $5,000 in 1954. Respondent, in his statutory notice, determined that the aforesaid payments in 1952 caused a complete recovery of the basis of said notes and, hence, that petitioner realized income from the payments in the taxable year 1954 in the amount of $5,000. Petitioner also received maturity payments on the Cooper purchase notes in the amount of $2,500 in each of the years 1952, 1953, and 1954. Respondent, in his statutory notice, determined that the payments in 1952 reduced the basis of said notes to $2,370; that the payments in 1953 brought about a complete recovery of the basis and resulted in taxable income in the amount of $130; and that the payments in 1954 resulted in the realization of taxable income in the amount of $2,500. By amended answer, respondent asserted that the maturity payments on the Cooper purchase notes enabled petitioner to realize taxable income in the amount of $1,015 for the year 1953, rather than the sum of $130, as originally determined, to be discussed *infra*.

It is respondent's position that under section 113(a)(13), the basis of the maturing securities above referred to "is such part of the basis in his hands of his partnership interest as is properly allocable to such property," and that the portion of his partnership interest "properly allocable" to the property is determined by the relative fair market values of the assets subject to the allocation. Respondent determined that the fair market values of the assets in question as of May 29, 1951, were the same as the adjusted tax basis of the assets to the partnership. Respondent's schedule designated "Disposition on Dissolution (5–29–51)" shows the basis, *inter alia*, of the Primrose refunding notes and Cooper purchase notes, as of May 25, 1951, to be in the stipulated amount of $5,100 and $12,000, respectively, of which the respective amounts (basis) of $1,156 and $2,651 were attributed to petitioner's interest therein. Respondent's determination of basis and fair market value of the securities in question is prima facie correct and petitioner has the burden of proving error therein. See *Long* v. *Commissioner*, 96 F. 2d 270 (C.A. 9, 1938), certiorari denied 305 U.S. 616 (1938). The record contains no affirmative evidence

tending to show that the fair market value at the time here material was other than that determined by respondent, and petitioner apparently does not challenge such fair market value.

We are mindful that in May 1956, petitioners submitted a "collateral agreement" to the Commissioner in Docket No. 52461, set forth *in extenso* in our Findings of Fact, in which petitioners asserted that as consideration for acceptance by the Commissioner of a proposal for settlement of the case in Docket No. 52461, pursuant to a stipulation of deficiency, the bases of the Primrose and Cooper purchase notes on acquisition in August 1945 were in the respective amounts of $21,000 and $39,500. Obviously, said amounts are considerably higher than those stipulated by the parties in the instant case. We must recognize, however, that the stipulation of the parties as to facts in the instant proceeding must supersede any prior agreement in another case, even assuming (although we have no evidence to that effect) that said agreement was accepted by the Commissioner as part of the stipulated deficiency in Docket No. 52461.

Respondent filed an amended answer claiming an increased deficiency in the amount of $300.90 for the taxable year 1953, or a total deficiency in that year of $598.60. Respondent contends that in his original determination he mistakenly allocated a basis of $4,870 to certain Cooper purchase notes. Maturity payments in the amount of $2,500 were received on said notes in each of the years 1952 and 1953. As a result of the maturity payments, respondent, in his statutory notice, determined that petitioner recovered in full the basis of the Cooper purchase notes, and, in addition, realized income in the taxable year 1953 in the amount of $130.

After the notice of deficiency was mailed, the parties stipulated that certain Bonnie notes had a basis in the hands of the partnership on May 25, 1951, in the amount of $13,500, rather than $2,570, as set forth in respondent's statutory determination. It is respondent's contention that the stipulation of the correct partnership basis for the Bonnie notes necessitates an allocation of basis to the Cooper purchase notes in the amount of $3,985 instead of $4,870 as set forth in his original determination. He argues that the maturity payments in the amount of $2,500 in 1952 and 1953, respectively, permitted a complete recovery of the basis of the Cooper purchase notes and resulted in the realization by petitioner of gain in the amount of $1,015 for the taxable year 1953, rather than the sum of $130 as determined originally.

We think the record supports respondent's position with respect to the basis of the Cooper notes, and petitioner does not appear to contest the issue. We accordingly hold for respondent on this factor.

### III. *Registration of Primrose and Cooper Notes.*

Respondent contends that since the Primrose and refunding Cooper purchase notes did not contain wording indicating that transfers were invalid unless registered on the books of the obligor corporation, Miller-duPont, Inc., said notes were not issued "in registered form" within the meaning of sections 117(f) and 1232(a)(1) of the 1939 and 1954 Codes,[2] respectively, and hence the maturity payments received by petitioners in excess of the basis of the notes were taxable as ordinary income. We disagree. Admittedly, the notes in question were not in registered form within the ambit of the statute at the time of issuance. Prior to April 1, 1952, said notes bore no reference to the subject of registration. We think, however, that the law is now clear that the evidence of indebtedness may be put into registered form subsequent to issuance. Sec. 1232(a)(1) of the 1954 Code. *Lurie* v. *Commissioner*, 156 F. 2d 436 (C.A. 9, 1946). While *Lurie* reverses 4 T.C. 1065, we have followed the reversal in *Carl Oestreicher*, 20 T.C. 12, 14 (1953). The narrow question presented, therefore, is whether the notes in controversy were in registered form after issuance by Miller-duPont, Inc.

The record shows that on or about April 1, 1952, the board of directors of the obligor corporation, Miller-duPont, Inc., of which petitioner was president, authorized the registration of previously issued Primrose refunding and Cooper purchase notes. Shortly thereafter, the two Primrose notes paid in 1954 and the Cooper notes paid in 1953 and 1954, were presented to the secretary of the obligor corporation and she stamped the word "registered" on the face of each note above the printed word "bearer," so as to read, "Pay to the order of Registered Bearer . . . Payable at our office . . . ." Notations of ownership of the notes in question were made in the records of Miller-duPont, Inc. It appears that the registration was bona fide, and respondent does not urge otherwise.

Registration, for practical purposes, means that the obligation runs only to the registered owner. The primary purpose is to safeguard

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

(f) RETIREMENT OF BONDS, ETC.—For the purposes of this chapter, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor.

SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS.

(a) GENERAL RULE.—For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof—

(1) RETIREMENT.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).

the investor or holder by making unregistered transfers ineffective. To accomplish this, the note or other evidence of indebtedness must show on its face that it is registered. *Gerard* v. *Helvering*, 120 F. 2d 235 (C.A. 2, 1941), affirming 40 B.T.A. 64 (1939). Likewise, the phrase "in registered form" implies, at least, that the ownership of the instrument is listed in an appropriate record or register maintained for that purpose by the issuing corporation.

While in the instant case the steps taken to register the obligations might be termed somewhat informal, we are satisfied that the purpose of registration was satisfied as a practical matter, and that the provisions of section 117(f) were complied with. We hold, therefore, that the notes involved were "in registered form" within the meaning of sections 117(f) and 1232 of the 1939 and 1954 Codes, respectively, and, as a result, the gain realized upon retirement thereof was entitled to capital gains treatment. *Carl Oestreicher*, *supra* at 14, and cases cited therein.

Respondent relies on *Gerard* v. *Helvering*, *supra*. We think it distinguishable from the instant case on the facts since, in *Gerard*, there appears to have been no registration, formal or informal; the bond does not appear to have been stamped as "registered," and the only record was the carrying of the bond on the books of the issuer as a liability.

*Decision will be entered under Rule 50.*