ERNEST A. WILSON AND MARJORIE WILSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2597–65.   Filed February 5, 1969.

*Max Weingarten*, for the petitioners.
*Leo A. McLaughlin*, for the respondent.

HOYT, *Judge:* Respondent determined deficiencies in petitioners' income taxes in the following years and amounts:

| Year | Deficiency |
| --- | --- |
| 1961 | $23, 773. 87 |
| 1962 | 30, 500. 74 |
| 1963 | 31, 242. 41 |

After concession of certain issues by petitioners, only two issues remain for decision:

(1) Whether certain water refund contracts are "evidences of indebtedness" within the meaning of section 1232(a),[1] thus qualifying amounts received on their retirement as amounts received in exchange therefor, and

(2) If this issue is decided affirmatively, whether water refund contracts which were issued before January 1, 1955, were evidences of indebtedness "in registered form" within the meaning of section 1232(a)(1).

### FINDINGS OF FACT

Those facts which were stipulated are found accordingly, and are incorporated herein by this reference, together with the stipulated exhibits.

Petitioners Ernest A. Wilson and Marjorie Wilson are husband and

[1] All section references are to the Internal Revenue Code of 1954 except as otherwise specified.

wife. At the time the petition was filed herein, their residence was Hillsborough, Calif. They filed joint income tax returns for those years with the district director of internal revenue, San Francisco, Calif. Hereafter, Ernest will sometimes be referred to as petitioner.

During 1961, 1962, and 1963, petitioners held certain water refund contracts and received payments thereunder. The amounts received therefrom by petitioners and applied to recovery of cost and the amounts reported as gain in excess of cost were as follows:

| Amount received and applied to recovery of cost | | Amount reported as gain | |
|---|---|---|---|
| Year | Amount | Year | Amount |
| 1961 | $79,766.70 | 1961 | [1] $44,427.64 |
| 1962 | 63,426.63 | 1962 | 65,434.92 |
| 1963 | 86,132.22 | 1963 | 59,389.60 |

[1] Although this is the reported amount, the parties have stipulated that the gains received in 1961 totaled $44,427.66.

Water refund contracts are executed under the rules of the California Public Utilities Commission in the case of investor-owned public utility water companies in that State or under the rules and regulations of various political subdivisions of governmental bodies in the case of publicly owned water companies. When developers of new subdivisions, housing projects, or industrial tracts request local water companies to supply the new development with water, the rules of the commission or of the governmental bodies require the developer to advance to the water company funds necessary to construct the new facilities and connect the lines of the water company with the distribution facilities for the new development. The funds so advanced are treated by the water company as a liability either under the heading "Advances for Construction" or "Water Rebate Contracts Payable." The new mains and waterlines become the property of the water utility and are ultimately paid for by the utility from its revenues derived from the area. The amount is refunded by the water company to the developer, without interest, pursuant to the terms of the water refund contract.

All of the contracts in this proceeding provide for refunds pursuant to the "percentage of revenue" method. Under this method, the water company agrees to refund the advanced funds by paying to the developer or, as in the present case, his assignee, for a specified number of years, a certain percentage of the company's annual gross revenue derived from customers connected to the extension for which the cost was advanced. Generally, contracts executed prior to October 8, 1954, provided for a refund of 35 percent of such gross revenue for 10 years. Contracts executed subsequent to that date provided for a refund of 22 percent of the revenues for 20 years. Although the repay-

ment terms of some contracts differ in minor respects, and one contract provided for repayment based upon cubic feet of water consumed, they all fall generally within the above-described outlines, and the differences are immaterial for purposes of deciding the issues presented for decision here. The refund payments were made annually, semiannually, or quarterly.

The payments were to cease, according to the contracts, if either the advance was fully paid prior to the expiration of the designated number of years, or upon expiration of the specified number of years. In the latter event, the remaining unpaid balance was treated by the water company as a contribution in aid of construction and of course the holder of the contract could expect no further payments.

Petitioner frequently purchased water refund contracts from the original developers. All of the contracts in question were purchased in the open market for cash. He paid from 25 to 50 percent of the amount refundable at the time of his purchase. Before purchasing a contract, petitioner investigated the company itself, the developer, and the average rate at which he might recover not only his own investment, but also the face value of the contract. The purchase price which petitioner paid was therefore based upon his computations of definitely expected revenue, rather than the face amount. Occasionally petitioner purchased contracts which expired prior to payment of the face amount, but he always recovered his own cost.

Upon acquiring all the water refund contracts involved in this proceeding, petitioner obtained from the seller an assignment of the contract, notified the water company of such assignment and of petitioner's address, received confirmation from the water company of the unpaid balance, that it approved the assignment and that it had recorded such assignment on its books. From that time on, petitioner received the payments due pursuant to the terms of the water refund contract he had purchased. None of the subject contracts bears any inscriptions as to nontransferability, or that the obligor maintains such records. All of the subject contracts are binding upon and inure to the benefit of the successors and assignees of the respective parties and thus assignment is contemplated therein but no specification as to the manner of assignment is set forth or required.

Petitioners reported gain from the payments on their water refund contracts on the cost recovery method, so that gain was only reported after payments received exceeded petitioners' cost. For purposes of this case respondent has no objection to the use of this method.

Petitioners owned seven water refund contracts, involved herein, which were issued before October 8, 1954. The amounts realized over petitioners' investment in those contracts were $25,501.38 in 1961,

$36,796.65 in 1962, and $25,309.56 in 1963. Such amounts were reported as long-term capital gain. They also owned 34 water refund contracts, which were issued after October 8, 1954. The amounts realized over their investment in these contracts were $18,926.26 in 1961, $28,638.27 in 1962, and $34,080.04 in 1963. Such amounts were also reported as long-term capital gain.

It is conceded by respondent that the water refund contracts themselves were capital assets in the hands of petitioners. At the time the payments involved herein were received by petitioners, they had held the contracts for more than 6 months.

On November 8, 1962, the California Public Utilities Commission amended its main extension rule. It was resolved that thereafter, with respect to all water refund contracts entered into before November 28, 1962, where 80 percent of the bona fide customers for which the extension was designed were being served therefrom, the water company could negotiate and enter into a new and substitute contract which differed from the original in one respect. If the 80-percent requirement was being met, then any unrefunded balance remaining at the termination date was to be paid in five equal annual installments beginning 1 year after the termination date. Various of the petitioners' contracts issued before November 28, 1962, reached the 80 percent level, and pursuant to the above-described resolution, at least 15 contracts were amended to provide for unconditional payment of any remaining balance at the contract's termination date.

Of the water contracts herein involved, the following were issued before January 1, 1955:

| Water company | Contract date | Water company | Contract date |
|---|---|---|---|
| Dominguez Water Corp. | Sept. 19, 1951 | Suburban Water Systems. | Oct. 18, 1954 |
| Dyke Water Co | May 26, 1953 | Suburban Water Systems. | Oct. 29, 1954 |
| Dominguez Water Corp. | June 27, 1953 | Santa Paula Water Works, Ltd. | Nov. 18, 1954 |
| Las Vegas Valley Water District. | Oct. 28, 1953 | Suburban Water Systems. | Nov. 22, 1954 |
| City of Sunnyvale | Dec. 15, 1953 | Dyke Water Co | Dec. 27, 1954 |
| Las Vegas Valley Water District. | Mar. 3, 1954 | Dyke Water Co | Dec. 27, 1954 |
| Fruitridge Vista Water Co. | Aug. 27, 1954 | | |
| Suburban Water Systems. | Oct. 11, 1954 | | |

All the water companies which issued the contracts involved herein were either corporations, governments, or political subdivisions thereof.

In his deficiency notice for each year respondent determined that the water refund contract receipts in excess of basis represent ordinary income, not capital gain as reported. Additional income was accordingly determined for each year.

OPINION

The first issue presented for decision is whether the water refund contracts held by petitioners are "evidences of indebtedness" within the meaning of section 1232(a), the material parts of which are as follows:

SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS.

(a) GENERAL RULE.—For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof—

(1) RETIREMENT.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).

Thus, if the contracts are in fact "evidences of indebtedness" within the meaning of that section, the amounts realized by petitioner above his cost basis will be considered as an amount received in exchange therefor and entitled to capital gain treatment. If they do not qualify, the amounts so realized will be ordinary income instead.

If we decide affirmatively on that issue, we then must decide whether the contracts issued before January 1, 1955, were "in registered form." According to the above-quoted statutory provisions, any contracts issued before that date must be "in registered form" in order to qualify for section 1232 treatment.

Since the parties agreed at trial that the contracts were in fact capital assets, we need not deal with that requirement; there is also no question that the contracts were issued by a corporation, government, or political subdivision thereof. Neither is there any controversy that the amounts received by petitioner were in "retirement" of the contracts.

## Evidence of Indebtedness

Respondent contends that the contracts in issue are not evidences of indebtedness because in petitioner's hands they represented nothing more than contingent rights to share in future revenues, if produced. The statute allows preferential treatment to "bonds, debentures, notes, or certificates or other evidences of indebtedness." Urging application of the doctrine of *noscitur a sociis*, respondent asks us to conclude that we are to interpret the phrase "evidences of indebtedness" from the words that surround it. He cites, *inter alia*, *Frank J. Cobbs*, 39 B.T.A. 642 (1939), affirmed per curiam 111 F. 2d 644 (C.A. 9, 1940), where the Court used that doctrine to hold that the statute did not embrace

the surrender of an insurance or annuity contract. Respondent also asks us to apply the doctrine of *ejusdem generis* which dictates that where general words follow an enumeration of persons or things, the general words should be construed not in their broadest sense, but rather as applying to the same class as those specifically mentioned. Respondent submits that using these methods of interpretation the contracts here involved cannot be "evidences of indebtedness" since they are not of the same class or similar to "bonds, debentures, notes, or certificates." He cites H. Rept. No. 704, 73d Cong., 2d Sess., 1939–1 C.B. (Part 2) 554, 577, as evidence that Congress did not intend that every corporate obligation be included within the statutory language employed.

Respondent also argues that to be an evidence of indebtedness, the instrument must disclose on its face an unconditional obligation on the part of the obligor to pay a sum certain in money at a fixed or determinable time. He would have us conclude that since the contracts reflect only a contingent right to share in revenues, the contracts do not qualify for section 1232 treatment. He urges that an obligation to pay a percentage of gross revenues from a particular venture for a limited period of time, subject to the limitation that the payments will not exceed the sum advanced, does not represent indebtedness.

Petitioner, on the other hand, argues simply that each contract was an unconditional promise to pay a fixed amount of money within a designated period, out of a designated source. Citing several cases, he urges that because the debt is to be paid from a designated source does not detract from the essential nature of the contract as an evidence of debt; the parties treated the refund obligation as a debt in the nature of those dealt with by section 1232 and so should we. He also contends that the statutory language is very broad and should not be narrowly applied. He relies on *McClain* v. *Commissioner*, 311 U.S. 527 (1941); *Toye* v. *United States*, 157 F. Supp. 123 (E.D. La. 1957); *Vance* v. *Kavanagh*, 100 F. Supp. 899 (E.D. Mich. 1951) and *Jamison* v. *United States*, 297 F. Supp. 221 (N.D. Cal. 1968).

We find nothing in either *Frank J. Cobbs, supra, Mary D. Gerard*, 40 B.T.A. 64 (1939), affd. 120 F. 2d 235 (C.A. 2, 1941), or the other cases relied on by respondent, which dictates the result to be reached here with respect to these water refund contracts. Basically they require the builder or developer who wishes to obtain water service for his real estate project to advance the funds to finance the desired extension of water service facilities. Once the obligations of the builder or developer have been fulfilled and the money advanced, the water company or utility is obligated to repay the advancements as outlined above. Respondent contends that the covenants contained in the con-

tracts, in addition to repayment of the advanced funds, lift them from the statutory phrase "evidences of indebtedness," and require instead the categorization "contracts of indebtedness." The statute allows preferential treatment to "bonds, debentures, notes, or certificates or other evidences of indebtedness." None of the statutorily enumerated obligations generally contains any promises other than to pay the sums specified in the instrument. The question here is therefore whether the promises contained in the present instruments disqualifies them from the group of "other evidences of indebtedness." We think they do not.

The water refund contracts in question closely resemble bonds or certificates promulgated as a part of fund-raising efforts, and issued by public or quasi-public corporations. Their principal function was to acknowledge formally the advancement of the funds by the obligee, and to outline the repayment procedures and the conditions attached thereto. The additional promises contained in the water refund contracts were secondary in importance to the repayment procedures and conditions and when they were purchased on the open market for cash by petitioners they were merely evidences that the advances therein recited would be repaid. Under all of the facts and circumstances here presented, the contracts in question were very much like revenue bonds or debentures issued to finance the installation of specific facilities.

We agree with respondent that section 1232 was not intended to cover all corporate contractual obligations to pay money and that the collection or settlement of a contractual obligation does not, in the absence of statutory authority to the contrary, constitute a sale or exchange for Federal income tax purposes. See *Fairbanks* v. *United States*, 306 U.S. 436 (1939); *Galvin Hudson*, 20 T.C. 734 (1953). However, as mentioned, the parties here have stipulated that for the purposes of this case the payments in question were received in retirement of the water refund contracts and that the contracts were capital assets held for more than 6 months by petitioners. We do not view and cannot categorize the contracts in issue as respondent urges. They were not merely choses in action or simple contracts representing contingent rights to share in future revenues; as we view them they were written obligations to repay borrowed funds used to finance construction of new and additional water service facilities, and the revenues collected from those new facilities were the source of the funds for repayment of the indebtedness.

It is not necessary to attach such labels as bonds, debentures, notes, or certificates to the water refund contracts before us, nor would such a label, if attached, determine the question. The basic element

and substance of the water refund contracts in question, however, bear strong resemblance to the underlying and basic elements of the enumerated instruments. The statute before us confers preferred treatment not only on those enumerated instruments, but also on any other "evidences of indebtedness." When the basic nature of the contracts is considered in the light of the statutory language used, we cannot accept respondent's argument or restrict the statutory application as he urges.

The water refund contracts do evidence debts and the various covenants contained in them are not fatal to their status as evidences of indebtedness. They were clearly the evidences of the water companies' debts to repay advances used to finance the expansion of facilities. As noted in our Findings of Fact, the advanced funds were carried by the water companies and municipalities as liabilities on their books. The contracts initially provided for a specified percentage of the annual gross revenues of the company or municipality from the facilities constructed with the advances, to be paid to the obligee, or its assignee, for a specified number of years. All of the 41 contracts involved in this proceeding were definite in those respects. Total repayment of the advanced funds failed only if the specified number of years expired before the advance was repaid and many of the contracts were amended after the California Public Utilities Commission changed its rules in 1962, to provide that any unrefunded balance at the termination date of the contract would be paid in five equal installments in any event.

The water companies and municipalities in question were unconditionally obligated to repay the unpaid balance due when petitioners acquired the contracts as investments on the open market for cash. The amounts to be paid periodically to retire the indebtedness were computed with reference to the set percentage of the gross revenues derived from the facilities built with the advanced funds. If no revenues were produced and the specified period of time elapsed, then the unpaid obligation was discharged and the balance unrefunded was treated by the obligors as a "contribution in aid of construction."

Respondent argues that all of these provisions result in a contingent promise rather than a real obligation and that the refund agreements were merely contractual obligations and not the sort of evidences of indebtedness contemplated by the statute. We do not agree. We conclude and hold that the water refund contracts before us are of the same general type and in the same class as revenue bonds, certificates, or debentures to be repaid from a specified source of revenues and similar thereto so as to be evidences of indebtedness within the meaning of section 1232(a). If a promissory note, corporate bond, or debenture contained similar provisions, it would nonetheless qualify

for capital gains treatment and we can see no reason why the refund contracts before us do not likewise qualify under 1232(a). The fact that the obligation of the water company or utility to repay the advance was limited to a designated source of revenue does not make it any the less an indebtedness or obligation of the corporation, government, or political subdivision.

In *Bryant* v. *Commissioner*, 111 F. 2d 9 (C.A. 9, 1940), reversing 38 B.T.A. 618 (1938), the court looked at promises to repay bonds only from a certain fund by a California municipality; the issue was whether or not interest on street improvement bonds payable only from a special limited fund, was tax exempt as interest paid on an obligation of a political subdivision of a State. The court held that the bonds were nonetheless true obligations of the municipality and that merely because the City was obligated to pay only from a certain tax fund did not render it any less an obligation of the City. See also *Estate of Alexander J. Shamberg*, 3 T.C. 131 (1944), affd. 144 F. 2d 998 (C.A. 2, 1944); *Riverview State Bank*, 1 T.C. 1147 (1943). Of course, it is obvious that if the fund did not receive or contain money, the bonds would not have been repaid, there being no obligation generally or pledging of the obligor's credit to repay the bonds. This would be true with respect to any revenue bonds repayable from a limited or specified source of revenue such as utilities, toll bridges, or toll roads or similar facilities, the earnings of which provide the sole source of repayment. As the court observed in *Bryant* v. *Commissioner*, *supra:*

From the standpoint of the taxation of the interest as upon an obligation of the municipality we can see no difference between the income of this bond interest and interest on money lent to a borrower who agrees *to pay interest and principal only from the income from his apartment house which he mortgages to secure the loan.* [Emphasis supplied.]

\* \* \* \* \* \* \*

The Commissioner's cases do not and could not hold that the municipality, in obtaining its general improvements by its bond promises to collect the tax and pay the bondholder from the bond fund, is any the less engaged in borrowing than is one who obtains a loan with a promise to repay it from the income of a specific parcel of the borrower's property which is mortgaged for the debt.

The Commissioner's regulations [2] refer to the debts represented by the instruments enumerated in section 1232 as "obligations." We find it easy to say that the contracts held by petitioner were true obliga-

---

[2] Sec. 1.1232-1. Bonds and other evidences of indebtedness; scope of section.

(a) *In general.* Section 1232 applies to any bond, debenture, note, or certificate or other evidence of indebtedness (referred to in this section and §§ 1.1232-2 through 1.1232-4 as an obligation) (1) which is a capital asset in the hands of the taxpayer, and (2) which is issued by any corporation, or by any government or political subdivision thereof. In general, section 1232(a)(1) provides that the retirement of an obligation, other than certain obligations issued before January 1, 1955, is considered to be an exchange and, therefore, is usually subject to capital gain or loss treatment; \* \* \*

tions in the nature of revenue bonds or certificates to repay funds in effect borrowed to finance extensions of water facilities into new areas. To exclude the obligations before us from the scope of "evidences of indebtedness" would require a narrow and unwarranted interpretation of the statutory terminology which we are unwilling to adopt. Neither the legislative history, the rules of statutory interpretation relied on by respondent, nor the decided cases dictate such a reading. The contracts under our glass were viewed as liabilities by all the obligors; petitioner treated them as amounts owed to him. We hold that the water refund contracts in question were arm's length, legitimate obligations evidencing debt in the nature of the bonds, debentures, notes, and certificates mentioned by the statute. As such they are "other evidences of indebtedness" within the ordinary meaning of those words as used in section 1232, viewed in the light of the legislative purpose and the other language employed. *Jamison* v. *United States, supra.*

### Registered Form

Finally, we must determine whether those contracts issued before January 1, 1955, were "in registered form" as required by section 1232(a)(1) in order to receive the preferential treatment as specified in the statute.

As we noted in our Findings of Fact, petitioner obtained assignment of each contract from each seller, notified the water company of the assignment and of his address, and received confirmation from the water company of the unpaid balance, that it approved the assignment, and that it had recorded the assignment on its books. From that time on, petitioner received the payments due from the water company pursuant to the terms of the contract. We also found that none of the contracts bears any inscription or note of any kind as to nontransferability or registration.

The phrase "in registered form" refers to the overall procedure through which the obligation runs only to the registered owner. The primary purpose is to make any unregistered transfers ineffective, and the instrument always so provides on its face. The mere fact that the debtor keeps books of account upon which the debt appears is immaterial without a note of such registration on the face of the instrument. *Gerard* v. *Helvering*, 120 F. 2d 235 (C.A. 2, 1941), affirming 40 B.T.A. 64 (1939).

In *Victor A. Miller*, 32 T.C. 954 (1959), reversed on other grounds 285 F. 2d 843 (C.A. 10, 1960), we held that in order to accomplish the purpose of the registration procedure, the evidence of indebtedness must show on its face that it was registered. We also noted that the ownership of the instrument must also be listed in the appropriate

record maintained by the issuing company. The two requirements thus seem to go hand-in-hand; not only must the registration be noted on the face of the instrument, but the obligor must record the ownership status. See also *KVP Sutherland Paper Co.* v. *United States*, 344 F. 2d 377 (Ct. Cl. 1965).

Petitioner cites *Carl Oestreicher*, 20 T.C. 12 (1953), as standing for the proposition that registry on the records of the company is in itself sufficient to place the instrument "in registered form." A reading of *Oestreicher* reveals use of a different rule than that abstracted by petitioner. The corporate records of registration were loosely kept, but the instrument provided that it was registered, transferable only on the books of the corporation by the registered owner, and that the note had to be presented for endorsement of payments on the principal. The Court held that those provisions in the note sufficiently established its registered form. *Gerard* v. *Helvering, supra*, was cited approvingly by the Court in *Oestreicher*, noting that an instrument must provide registration on its face in order to be "in registered form."

We therefore hold that although the contracts were "evidences of indebtedness," they were not "in registered form." Consequently, amounts received in retirement of those issued on or after January 1, 1955, may be considered as received in exchange therefor. Since any contracts issued before that date must be "in registered form" to qualify for section 1232 treatment, those which were issued before that date do not fall within the statute. Accordingly,

*Decision will be entered under Rule 50.*