MARWAIS STEEL COMPANY, A CALIFORNIA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 91236. Filed August 15, 1962.

*Robert L. Farmer, Esq.,* and *James N. Knecht, Jr., Esq.,* for the petitioner.

*Allan I. Blau, Esq.,* for the respondent.

FAY, *Judge:* The respondent determined deficiencies in the income tax of petitioner in the amounts of $7,361.73 and $15,147.26 for the years ended January 31, 1957, and January 31, 1958, respectively.

On February 12, 1962, respondent filed an amendment to answer and claimed increased deficiencies in the amounts of $2,514.41 and $85.58 for the years ended January 31, 1957, and January 31, 1958, respectively.

The only issue left unsettled by the parties involves whether or not the petitioner may carry over and deduct the net operating losses of its subsidiary under the provisions of sections 332 and 381 of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT.

Some of the facts were stipulated, and they are included herein by this reference.

The petitioner is a California corporation, incorporated on June 28, 1949, with its principal place of business in Los Angeles, California. It filed its Federal income tax returns for the years ended January 31, 1953, through January 31, 1959, with the district director of internal revenue, Los Angeles, California. During the taxable years involved herein petitioner was on the accrual basis of accounting and utilized the reserve method of accounting to provide for bad debts.

Petitioner at all times since its inception engaged in the sale and distribution of secondary flat-rolled steel products, principally in the area of southern California. The term "secondary steel" connotes a broad category of flat-rolled steel which does not meet certain customers' requirements or specifications. At all times since petitioner's inception to the present, Marshall I. Wais, hereinafter referred to as Wais, has been its president, principal managing officer, director, and controlling shareholder. Since November 10, 1950, Wais has also been treasurer of the petitioner.

Steel Processing and Distribution Company, hereinafter referred to as S.P.D., was a California corporation which was incorporated on August 20, 1950. S.P.D. originally engaged in the business of slitting coiled steel pipe stock and other steel processing. It also engaged in the sale of prime steel products and had its principal business activity in the San Francisco Bay area. At all times material herein Wais was the president, treasurer, principal managing officer, and a director of S.P.D.

The originally issued and outstanding capital stock of S.P.D., consisting of 50 shares of $100-par-value common stock, was issued to and purchased by petitioner. On or about July 11, 1951, Wais purchased,

---

[1] The issue raised by respondent's adjustments in each of the taxable years with regard to petitioner's charitable contributions will automatically be resolved upon the basis of the foregoing issue.

at par, 94 percent of the issued and outstanding common stock of S.P.D. from petitioner. From July 14, 1952, Wais owned all the issued and outstanding common stock of S.P.D. On or about September 2, 1958, S.P.D. merged with petitioner.

Wilmington Metal Manufacturing Company, hereinafter referred to as Wilmington, was a California corporation incorporated on August 27, 1951, with its principal place of business in Los Angeles, California. Wais was the president of Wilmington at all times from June 18, 1954, to August 22, 1956, and at all times prior to its dissolution he was a director thereof.

The originally issued and outstanding capital stock of Wilmington consisted of 50 shares of no-par stock, which stock was issued to and purchased by petitioner in consideration of the cancellation of $5,000 of indebtedness owed by Wilmington to petitioner.

Petitioner caused the formation of Wilmington for two principal reasons. In the short run, petitioner felt that existing market conditions would enable Wilmington to engage profitably in a steel fabricating operation. The long-range reason for the formation of Wilmington was petitioner's desire to engage in manufacturing operations related to its steel business which might offset the cyclical nature of the steel business generally.

In September 1951, following its incorporation, Wilmington purchased for approximately $33,928 certain machinery, equipment, dies, inventories, and furniture and fixtures from Metal Stamping & Manufacturing Company, an unrelated California corporation, which had conducted an automobile accessory manufacturing business at 11215 S. Wilmington Avenue, Los Angeles, California. Wilmington also entered into a 2-year lease on or about September 1, 1951, pursuant to which Wilmington obtained occupancy of the manufacturing plant of Metal Stamping & Manufacturing Company and the use of certain machinery and equipment located in said plant. Wilmington thereupon commenced the manufacture and sale of automobile accessories with particular emphasis on wheels and fender skirts.

Wilmington was not successful in the wheel-manufacturing business, and the volume of its wheel sales declined from approximately $117,000 for the year ended September 30, 1952, to approximately $31,000 for the year ended September 30, 1953.

In 1953, due to Wilmington's poor sales volume and to the fact that its lease was due to expire on August 31, 1953, the possibility of liquidating Wilmington was considered by Wais. However, a contract was obtained with the Chevrolet Division of General Motors Corporation to manufacture original equipment automobile fender skirts, and Wais decided to allow Wilmington to remain in business.

Upon the expiration of its lease in August 1953, Wilmington moved its plant to Lynwood, California. Thereafter, Wilmington discon-

tinued the manufacture and sale of wheels and allocated a major portion of its business activity to the manufacture and sale of original equipment fender skirts. Wilmington, in addition, manufactured other miscellaneous automobile accessories in minor amounts at this time. Due to automobile model changes and Wilmington's inability to perform its contracts, the automobile fender skirt business also proved to be unprofitable, and it was discontinued in the year ended September 30, 1954.

During the period from September 1951 to March 31, 1955, in which Wilmington was engaged in active business operations, it purchased steel from petitioner and S.P.D. In addition, during this period both petitioner and S.P.D. from time to time advanced various amounts of cash to Wilmington and incurred and paid expenses on behalf of Wilmington. At various times Wilmington made payments to petitioner and S.P.D. on account of these purchases, advances, and expense payments. At all times these intercompany transactions between Wilmington and petitioner and between Wilmington and S.P.D. were reflected as accounts payable on the books of Wilmington and as trade accounts receivable on the books of petitioner and S.P.D., respectively.[2]

From its inception until March 31, 1955, when it ceased manufacturing, Wilmington's operations were financially unsuccessful. On its income tax returns for the period August 27, 1951, to September 30, 1951, and for the years ended September 30, 1952, through September 30, 1955, Wilmington reported the following net operating losses:

| | |
|---|---:|
| Period 8/27/51–9/30/51 | $2, 769. 19 |
| Year ended 9/30/52 | 24, 022. 77 |
| Year ended 9/30/53 | 17, 971. 95 |
| Year ended 9/30/54 | 8, 457. 29 |
| Year ended 9/30/55 | 8, 832. 49 |
| Total losses | 62, 053. 69 |

At September 30, 1951, to September 30, 1954, and at March 31, 1955, Wilmington's liabilities exceeded its assets by the following amounts:

| | |
|---|---:|
| Sept. 30, 1951 | $2, 969. 19 |
| Sept. 30, 1952 | 21, 792. 96 |
| Sept. 30, 1953 | 39, 774. 91 |
| Sept. 30, 1954 | 48, 251. 70 |
| Mar. 31, 1955 | 55, 898. 97 |

In the year ended January 31, 1953, petitioner determined that the Wilmington debt was uncollectible to the extent of $22,000. Accord-

[2] After July 31, 1953, in the case of S.P.D., and after September 30, 1953, in the case of petitioner, the intercompany transactions with Wilmington were reflected on the books of petitioner and S.P.D., respectively, in an account entitled "accounts-receivable—Wilmington."

ingly, petitioner increased its reserve for bad debts by $22,000 and claimed a deduction for bad debts in said amount on its income tax return for the year ended January 31, 1953. Petitioner also determined that the stock of Wilmington was totally worthless in the year ended January 31, 1953, and claimed a worthless stock deduction on its income tax return for said year in the amount of $5,000.

Commencing in 1954 Wilmington began to receive product liability claims as a result of a defectively manufactured trailer wheel. The claims originated with trailer owners who asserted damages against the trailer manufacturers, Wilmington's customers, who in turn made claim against Wilmington. The wheels were analyzed and it was determined that the defect in the wheels was due primarily to improper manufacturing, namely, the use of countersunk rivets to join various parts of the wheel. Once it was shown that Wilmington was the manufacturer of the claimed defective wheel, Wilmington acknowledged its liability on all wheel product liability claims.

Prior to 1954 Wilmington was covered by product liability insurance under a policy issued by Lloyds of London. Product liability insurance covers personal injury and property damage claims arising during the policy period from defective products irrespective of the date of manufacture of the defective product. The Lloyds policy was terminated on April 22, 1954.

From April 22, 1954, to June 28, 1954, Wilmington did not carry any product liability insurance. On June 28, 1954, Wilmington and petitioner obtained product liability insurance coverage for one year with St. Paul Fire and Marine Insurance Company. However, upon the expiration of Wilmington's product liability policy on or about June 28, 1955, no agreement could be reached between Wilmington and St. Paul regarding the renewal of the policy. Accordingly, after June 28, 1955, Wilmington had no product liability insurance. Petitioner, however, continued to be covered during all times material herein by a St. Paul product liability policy.

During the course of its wheel-manufacturing operations, Wilmington had manufactured and sold approximately 30,000 wheels, and as a result, Wais was very concerned about the potential liability of Wilmington for damages from defective wheels once the product liability insurance had lapsed. Since Wais still believed that a successful steel fabrication business could be developed if given enough time, it was decided that a new corporation should be formed to continue the fabricating business, which corporation would then be unhampered by claims arising from the defective wheels.

On January 21, 1955, the Moon Manufacturing Company, hereinafter referred to as Moon, was incorporated in the State of California. The originally issued and outstanding stock, consisting of 50 shares of no-par value, was issued to and purchased by Wais on or about

April 1, 1955. From the date of Moon's incorporation through all times material herein, Wais was the president, treasurer, principal managing officer, director, and sole shareholder of Moon. On or about September 2, 1958, Moon merged with petitioner.

By the time Moon was formed in January 1955 Wilmington had almost entirely discontinued business, and it was contemplated that Wilmington's business would soon be completely discontinued. On or about March 16, 1955, Wilmington entered into an agreement of sale with Moon whereby all the machinery, equipment, tools, dies, inventories, and supplies of Wilmington were sold to Moon at book value for cash in the amount of $9,867.76. On or about March 31, 1955, Wilmington ceased doing business, and on or about April 1, 1955, Moon commenced to manufacture and sell a wide variety of metal products almost entirely different from the products theretofore manufactured by Wilmington.

Following the discontinuance of Wilmington's business and the sale of Wilmington's assets to Moon, it was decided by the management of Wilmington, upon the advice of its attorneys, that Wilmington should be left inactive and hold nominal assets for an indefinite period of time to determine if further claims for defective wheels would materialize. It was felt that this would discourage any potential claimant; whereas, a dissolution of Wilmingtion might cause such a claimant to trace the liability of Wilmington to petitioner. Thereafter, Wilmington proceeded to collect its trade accounts receivable and, to the extent of available funds, proceeded to pay its creditors. By October 31, 1955, Wilmington had assets of $284.16 and liabilities of $57,466.66. The principal liability was an account payable to petitioner in the amount of $57,197.52.

During the year ended September 30, 1955, petitioner increased its reserve for bad debts account by $35,122.35, thereby reflecting on its reserve for bad debts the entire amount of the Wilmington account receivable.[3]

On or about December 19, 1955, Wais had a meeting with his attorneys and accountants for the purpose of discussing the possible disposition of Wilmington. Both tax and non-tax aspects of Wilmington's proposed dissolution were discussed. From a non-tax standpoint, Wais was informed that when a corporation was dissolved in California it was necessary to file a certificate of winding up and dissolution with the secretary of state, stating, *inter alia*, whether or not the corporation's debts had been paid or adequately provided for. After being so informed, Wais expressed concern over the fact that as a result of this certificate he might appear as part of an organization that was dissolved in an insolvent condition. Wais was then

---

[3] The Wilmington account receivable totaled $57,122.35. As noted previously, in 1953 petitioner had increased its reserve for bad debts by $22,000.

advised by his attorneys that if he desired to avoid such a situation, petitioner could forgive the debt of Wilmington and thereby enable Wilmington to dissolve as a solvent rather than an insolvent corporation.

From a tax point of view, the accountants advised Wais that a solvent dissolution of Wilmington might enable petitioner to carry over and deduct the net operating losses of Wilmington and also to obtain a bad debt deduction for advances made to Wilmington. At the conclusion of the discussion a decision was made that Wilmington would be dissolved as a solvent corporation. However, it was also determined that the actual dissolution of Wilmington would be postponed until such time as the potential defective wheel liability was no longer a source of concern.

On December 28, 1955, petitioner wrote off the Wilmington account receivable by debiting its reserve for bad debts account in the amount of $57,122.35 and crediting its account receivable—Wilmington account with the same amount. On its income tax return for the year ended January 31, 1956, petitioner deducted as a bad debt the amount of $40,544.91, of which $35,122.35 related to the Wilmington account receivable.

In May 1956 the insurance company notified petitioner that it was in the process of closing out its Wilmington defective wheel claims and that it anticipated little activity from then on with regard to the file. Wais then decided that the dissolution of Wilmington should be undertaken.

From November 1, 1955, until June 20, 1956, the financial position of Wilmington changed as follows:

(a) In December 1955 the account payable to petitioner was adjusted by $75.17 to correct a previous journal entry.

(b) In December 1955 an account payable in the amount of $165 to Forster & Gemmill, attorneys, was established.

(c) In January 1956 an account payable in the amount of $320 to Peat, Marwick, Mitchell Co., accountants, was established.

(d) In January 1956 the accrued taxes of $19.14 were paid.

On June 30, 1956, petitioner assumed the following liabilities of Wilmington:

(a) $250 due to Moon,

(b) $165 due to Forster & Gemmill, and

(c) $320 due to Peat, Marwick, Mitchell Co.

The assumption of these liabilities was reflected as a debit balance of $735 in the Wilmington account receivable on petitioner's books.

On July 16, 1956, a meeting of the board of directors of petitioner was held for the purpose of considering the cancellation of the $57,857.35 indebtedness due petitioner from Wilmington. The board of directors adopted the following resolution:

RESOLVED: That the indebtedness of Wilmington Metal Manufacturing Company in the amount of $57,857.35 to this company is hereby forgiven and cancelled.

On July 18, 1956, the board of directors of Wilmington adopted the following resolution:

RESOLVED: That this corporation shall voluntarily dissolve and wind up its affairs.

On the same day petitioner, the sole stockholder of Wilmington, consented in writing to the winding up of the affairs of Wilmington and to its voluntary dissolution. On August 9, 1956, Wilmington filed a Certificate of Election to Wind Up and Dissolve with the secretary of state of California.

As of August 15, 1956, Wilmington owned only the following assets:

| | |
|---|---|
| Cash | $91.02 |
| Utility deposits | 19.00 |

On August 20, 1956, Wilmington transferred said cash to petitioner and on the same day petitioner surrendered to Wilmington its Wilmington stock certificate for cancellation. (Wilmington's said utility deposits were retained by the utility companies and not entered on the books of petitioner.)

By resolution of Wilmington's board of directors, Wilmington was dissolved as of August 22, 1956. The Certificate of Winding Up and Dissolution of Wilmington was filed with the secretary of state of California on September 5, 1956.

On its Federal income tax return for the year ended August 22, 1956, Wilmington reported income of $110.02, representing the amount of Wilmington's assets after the forgiveness of indebtedness by petitioner.

Petitioner, purportedly in accordance with sections 332 and 381 of the Internal Revenue Code of 1954, carried over and deducted on its Federal income tax return for the year ended January 31, 1957, net operating losses of Wilmington in the amount of $23,967.52. For the year ended January 31, 1958, petitioner carried over and deducted on its Federal income tax return net operating losses of Wilmington in the amount of $35,807.35. As previously noted, the net operating losses of Wilmington for the fiscal years ended September 30, 1951, to September 30, 1955, inclusive, totaled $62,053.69.

Respondent disallowed the net operating loss deductions claimed by petitioner for the years ended January 31, 1957, and January 31, 1958, on the ground that petitioner failed to establish that the deductions were allowable.

OPINION.

On August 20, 1956, Wilmington transferred $91.02 to petitioner, and on the same day petitioner surrendered its Wilmington stock certificate to Wilmington for cancellation. On August 20, 1956, Wilmington had assets of $110.02 and no liabilities. The petitioner contends that as a result of the foregoing facts, it has satisfied the provisions of sections 332 and 381 of the Internal Revenue Code of 1954[4] and, therefore, that it is entitled to carry over and deduct the net operating losses of Wilmington.

The respondent takes the position that inasmuch as the petitioner has previously claimed deductions for losses resulting from the purported worthlessness of its loans to and capital investment in Wilmington, the effect of allowing petitioner to avail itself now of Wilmington's net operating losses would be to permit petitioner to use twice the losses of Wilmington for the reduction of petitioner's income. Such a result, respondent contends, is to be avoided where possible in construing laws passed by Congress.

The question whether a taxpayer is permitted to obtain what has been commonly referred to as a "double deduction" has been before this and other courts in numerous cases with varying results. *Ilfeld Co. v. Hernandez*, 292 U.S. 62 (1934); *United States v. Lakewood Engineering Co.*, 70 F. 2d 887 (C.A. 6, 1934); *Chicago & N.W. R. Co. v. Commissioner*, 114 F. 2d 882 (C.A. 7, 1940), affirming 39 B.T.A. 661 (1939), certiorari denied 312 U.S. 692 (1940); *Greif Cooperage Cor-*

---

[4] SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

(1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b)(2); * * *

* * * * * * *

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

* * * * * * *

(c) ITEMS OF THE DISTRIBUTOR OR TRANSFEROR CORPORATION.—The items referred to in subsection (a) are:

(1) NET OPERATING LOSS CARRYOVERS.—The net operating loss carryovers determined under section 172 * * *

SEC. 332. COMPLETE LIQUIDATIONS OF SUBSIDIARIES.

(a) GENERAL RULE.—No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation.

(b) LIQUIDATIONS TO WHICH SECTION APPLIES.—For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if—

* * * * * * *

(2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancellation or redemption of all its stock shall be considered an adoption of a plan of liquidation, even though no time for the completion of the transfer of the property is specified in such resolution; * * *

*poration,* 31 B.T.A. 374 (1934), affd. 85 F. 2d 365 (C.A. 3, 1936); *Taylor-Wharton Iron & Steel Co.,* 5 T.C. 768 (1945); *Joe A. Dewsbury,* 137 Ct. Cl. 1, 146 F. Supp. 467 (1956); *Maysteel Products, Inc.,* 33 T.C. 1021 (1960), revd. 287 F. 2d 429 (C.A. 7, 1961); *Fabreeka Products Co.,* 34 T.C. 290 (1960), revd. 294 F. 2d 876 (C.A. 1, 1961). None of these cases involved the exact issue presented by the instant case and, therefore, we deem it unnecessary to discuss all of them at length. Suffice it to say, we have considered them all and relying upon *Ilfeld Co. v. Hernandez, supra,* have reached the conclusion that the issue in this case must be decided against the petitioner.

In the *Ilfeld* case, a parent corporation had invested in the stock of and had made advances to its subsidiaries. Consolidated returns had been filed for the group in which losses of the subsidiaries had been deducted and had offset income of the parent. In a later period the subsidiaries were dissolved, and the parent sought to deduct from its income the losses resulting from its investment in the subsidiaries. In denying the parent corporation the right to deduct its investment loss, the Supreme Court stated, in part, as follows:

> The allowance claimed would permit petitioner twice to use the subsidiaries' losses for the reduction of its taxable income. By means of the consolidated returns in earlier years it was enabled to deduct them. And now it claims for 1929 deductions for diminution of assets resulting from the same losses. If allowed, this would be the practical equivalent of double deduction. In the absence of a provision of the Act definitely requiring it, a purpose so opposed to precedent and equality of treatment of taxpayers will not be attributed to lawmakers.

In the instant case the petitioner in earlier years, at a time when Wilmington had substantial net operating losses, claimed deductions totaling $62,122.35 for losses resulting from the presumed worthlessness of its loans to and investment in Wilmington.[5] During the taxable years involved herein the petitioner reduced its income by deducting net operating losses of Wilmington totaling $59,774.87 pursuant to the provisions of sections 332 and 381. While the chronological sequence of deductions was different in *Ilfeld,* i.e., the net operating losses were deducted first, we think it is obvious that the petitioner in the instant case also seeks the practical equivalent of a double deduction. Although the petitioner concedes, at least to some extent, that this may be so, it argues, in effect, that the *Ilfeld* rule is applicable only in those situations where the double deduction is achieved, in part, by means of a consolidated return and that, consequently, it has no application to a situation where the double deduction sought by a parent corporation is achieved by other means.

---

[5] The record amply supports the fact that the bad debt and worthless stock losses were directly traceable to the net operating losses sustained by Wilmington.

We can find no merit to such an argument. The Supreme Court in its opinion gave no indication that it intended the *Ilfeld* case to have such a restricted application and we can see no reason for placing such a limitation on its scope. See and compare *United States* v. *Lakewood, supra*, where the Circuit Court held that the rationale of the *Ilfeld* case was applicable not only to situations in which a parent corporation liquidated its subsidiary but was also applicable to situations in which the parent corporation sold its subsidiary's stock to outsiders.

Accordingly, we hold that in the absence of a provision in section 381 definitely permitting the allowance of a double deduction, the petitioner is precluded from carrying over the net operating losses of Wilmington in order to reduce its taxable income for the years ended January 31, 1957, and January 31, 1958.

*Decision will be entered under Rule 50.*