MILTON FALKOFF AND JEANNETTE L. FALKOFF, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2087–71. Filed May 15, 1974.

*Burton W. Kanter* and *Donald A. Statland,* for the petitioners.
*Seymour I. Sherman,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency of $104,-937.46 in petitioners' income tax for 1966. The issues remaining for decision are as follows:

(1) Whether petitioners' pro rata share of the proceeds of a purported loan of $500,000 by the Jupiter Corp. to Empire Properties, a partnership of which petitioner Milton Falkoff was a member, was taxable income;

(2) Whether petitioners' pro rata share of a $274,275 distribution to Empire Properties from Venture, a partnership in which Empire Properties was a limited partner, was taxable as ordinary income; and

(3) In the event the $274,275 distribution to Empire Properties is not taxable as ordinary income, whether petitioners' pro rata share of a portion of that amount was taxable as capital gain. The resolution of this issue depends upon the amount of Empire Properties' adjusted basis of its partnership interest in Venture.

FINDINGS OF FACT

At the time the petition was filed, petitioners were legal residents of Lincolnwood, Ill. They filed a joint Federal income tax return for 1966 on the cash receipts and disbursements basis with the district director of internal revenue at Chicago, Ill.

Since its inception in 1959 through the period in controversy, petitioner Milton Falkoff (who will be referred to herein as petitioner, singularly) had a 10-percent participating interest in an Illinois partnership known during 1966 and prior years as Empire Properties (Empire). Empire filed its partnership information returns on a calendar year basis.

By agreement dated March 1, 1962, Interstate Investments, Inc. (Interstate), a wholly owned subsidiary of the Jupiter Corp. (Jupiter), and Empire formed a limited partnership named Randolph-Outer Drive Venture (hereinafter Venture or the partnership) to acquire certain land and air rights from Interstate, and to develop, construct, and operate a high-rise building (sometimes hereinafter the project) thereon. Under this "Limited Partnership Agreement," Interstate was the general partner, with an interest of 77½ percent, and Empire was the limited partner, with an interest of 22½ percent. The rights and powers of the parties were to be determined in accordance with the Uniform Limited Partnership Act of the State of Illinois.

The initial capital of Venture was $20,000, of which Empire contributed $4,500 (or 22½ percent). The term of the partnership was for an initial period of 40 years. After that it was to continue "from fiscal year to fiscal year, unless at least three months prior to the end of any such additional fiscal year" any party gave written notice to the other parties "terminating * * * Venture as of the end of such additional fiscal year." Venture's taxable year ended on December 31 of each year. Prior to the end of the initial 40-year period, the partnership could be terminated by the written agreement of the parties. It could also terminate as of the end of any fiscal year in which all the partnership's property and assets were sold or otherwise disposed of.

Additional financing was to be obtained through a first-mortgage loan in the amount of $20 million. The record does not disclose with certainty whether a loan was obtained in this amount, the terms of the

loan which was obtained, or what amounts were paid on such indebtedness through 1966. Other amounts were to be advanced by Interstate to or on behalf of Venture to cover certain specified costs and expenses of Venture. All advances by Interstate prior to Venture's break-even point were to be made without interest and were repayable solely out of "Available Net Income," as defined by a written agreement and hereinafter described. After the break-even point had been reached, any amounts needed to continue Venture's operation were to be advanced by Interstate and Empire "in proportion to their then respective interests in the profits and losses of * * * Venture."

Under the terms of the limited partnership agreement, Interstate pledged various assets as collateral security to Empire, to assure Empire it would perform these obligations. Among the assets pledged by Interstate were the following:

1. Its 77½-percent interest in Venture.

2. All the capital stock of Outer-Drive East Corp. (ODE), a wholly owned subsidiary of Interstate.

3. All indebtedness and liabilities from Venture on account of advances by Interstate.

No interest in the partnership could be sold, assigned, transferred, pledged, encumbered, or otherwise disposed of in whole or in part, other than through assignment by Interstate of its 77½-percent interest to ODE. Any such assignment to ODE would not release Interstate from any of its liabilities or undertakings, including its obligation to provide financing.

On or about March 15, 1962, Interstate assigned its partnership interest in Venture to ODE.

By 1966 the real property and air rights owned by Venture had been improved with a 39-story building located at 400 East Randolph Street. As of June 1, 1966, ODE had made advances to Venture during the construction period and prior to the break-even point in the outstanding amount of $3,431,000.

In 1965 a group of investors (the Wilkow group) became interested in participating in the partnership. Under the agreements between Jupiter and its subsidiaries and Empire, it was necessary to secure Empire's consent to such participation. The Wilkow group formed two limited partnerships known as Outer-Drive East Associates (Associates) and Robert Wilkow Associates (Wilkow Associates) which were to become partners in Venture.

By June 2, 1966, the following had occurred:

(a) Associates and Wilkow Associates were admitted to Venture as limited partners.

(b) The interests of ODE and Empire in Venture were modified in several respects.

(c) Associates and Wilkow Associates jointly transferred to Venture $1,150,000, designated as a capital contribution, and $3,500,000, designated as loans for which the partnership subsequently issued notes calling for interest commencing January 1, 1967, at the rate of 4 percent per annum until December 1, 1983, and at the rate of 8 percent per annum on overdue principal and interest. None of the partners incurred any personal liability as a result of these loans.

(d) Venture used $3,431,000 of the loan funds, described in (c) above, to pay off the advances by ODE.

(e) The amount of $1,219,000 was paid over by Venture to ODE and Empire in proportion to their respective interests in Venture immediately prior to the admission of the new partners:

ODE_____ 77½ percent _____ $944, 725
Empire_____ 22½ percent_____ 274, 275

At about the same time these events were occurring,[1] Empire received $500,000 from Jupiter and gave Jupiter a "Revenue Note" that was dated June 2, 1966. Under the terms of that note, Empire promised to pay Jupiter, "or order, the principal sum of $500,000 and interest thereon at the rate of 4% per annum on or before December 31, 2002." These amounts were to be paid solely from available net income, and if the note was "not fully paid on maturity, i.e. December 31, 2002," the note "with all unpaid principal and accrued interest" was to "be deemed cancelled, paid and discharged."

The term "Available Net Income," as used in the note, includes the net income "from the operation and leasing of the Project determined in accordance with generally accepted accounting principles," increased by noncash charges deducted in computing net income and decreased by various nondeductible cash payments, certain reserves, and interest at the annual rate of 7 percent on post-break-even-point advances. Also included in that term are any "proceeds or sums distributed to or obtained by Empire as a result of any refinancing of * * * Venture or a sale of * * * Venture or any of its assets."

Attached to the note was an "Endorsement of Receipt" bearing the date of the note, wherein Jupiter acknowledged "receipt this date of the sum of $274,275.00 as repayment of principal under said Revenue Note," and acknowledged "the unpaid principal sum thereunder as of the date hereof is $225,725.00." After the close of the taxable year in controversy, additional payments have been made to reduce the principal balance to $92,420.71 as of July 1972; in addition, as of that date, interest of $26,445.71 has been paid on this note.

Each of the new partnerships, Associates and Wilkow Associates, was admitted to Venture as a limited partner under the terms of a

---

[1] The details regarding these occurrences are given later in our Findings.

written agreement dated May 25, 1966. Empire gave its consent to their admission.

By a "Security Agreement (Pledge)" dated May 25, 1966, ODE and Empire pledged their interests in the partnership as security for its payment of the $3,500,000 advance by the two new partners. This agreement placed numerous restrictions on the ability of ODE and Empire to deal with their respective interests in Venture.

In two other agreements entered into the same day and in another dated June 2, 1966, the parties agreed that ODE could mortgage, finance, remortgage, or refinance and encumber all or part of Venture's assets without Empire's consent only if the limited partners did not incur any personal liability and the payments of principal and interest did not exceed 7¼ percent of the principal per year. Jupiter and ODE guaranteed to Empire that the refinancing right would be exercised by ODE alone, without Empire's prior written consent, only to obtain funds to repay the loans from Associates and Wilkow Associates and the partnership's existing mortgage indebtedness and to purchase the interests of the Wilkow group entities in the partnership. Empire's consent was needed also if ODE wanted to sell, lease, or otherwise dispose of all or any substantial part of the project; ODE did not need Empire's consent for the sale of less than a substantial interest. In the event of a refinancing or sale of part or all of Venture's assets, Empire's share of the proceeds was to be distributed to it after payment of the partnership's existing mortgage indebtedness and the indebtedness owed to Associates and Wilkow Associates.

As a result of the foregoing, ODE's interest in Venture was reduced from 77½ percent to 57½ percent, and the $3,431,000 it had advanced to Venture was repaid. The newly admitted partners, Associates and Wilkow Associates, became entitled to aggregate preferential payments (prior to any distribution to ODE or Empire) of $372,000 annually. The partnership was required, after 8 years, to maintain a cash reserve of $372,000, and the newly admitted partners were given first priority to any cash flow from Venture. Empire's 22½-percent interest remained unchanged, and Empire received cash in the net amount of $500,000 in the form of a loan from Jupiter.

Empire's capital account in Venture as of December 31, 1966, was computed on Venture's return as follows:

| | |
|---|---|
| Cumulative net losses for the years 1962 to 1966 | [1]($601, 762) |
| Cash distributed, June 2, 1966 | (274, 275) |
| Original contribution to capital | 4, 500 |
| Negative capital balance 12/31/66 | (871, 537) |

[1] It appears that included in this figure is the amount Empire deducted on its 1966 return as its distributive share of Venture's 1966 losses, i.e. ($57,625.81).

With regard to the money Empire received from Jupiter in exchange for Empire's revenue note, the notice of deficiency to petitioners states:

It is determined that amounts totaling $500,000.00 received from Jupiter Corporation, involving financial transactions concerning the underlying property of the Randolph-Outer Drive Venture, constitutes [sic] income which was not reported on the tax return.

On brief, respondent concedes that this $500,000 item should be reduced by the $274,275 Empire repaid Jupiter in 1966, leaving $225,725 in dispute.

The notice of deficiency also states that:

It is determined that the distributions made by Randolph-Outer Drive Venture in the amount of $274,275.00 constitute income and such amount was not reported on the tax return.

### OPINION

### *Issue 1. The $500,000 Loan*

Respondent makes two closely related arguments as to the $500,000 item.[2] First, respondent urges that, although Empire gave Jupiter a note for the $500,000, the note did not create a bona fide obligation to repay that sum. Second, respondent contends that this sum was received by Empire as a payment for agreeing "to a transaction which required its consent and the terms of which were certainly detrimental to it" and beneficial to Jupiter. Petitioners take the position the $500,000 was a bona fide loan by Jupiter to Empire.

We agree with petitioners.

In exchange for the $500,000, Empire incurred an obligation to repay this sum, evidenced by the revenue note. While this note was payable only from available net income, as emphasized by respondent, such income was not limited to Empire's share of Venture's rental income derived from the building. The term "Available Net Income," as used in the note, also includes amounts Empire would receive as a result of any refinancing of Venture's property or from the sale of Venture or any of its assets. Also, ODE, a corporation controlled by Jupiter—the obligee of the note—could sell at least a minor part of Venture's assets without Empire's consent, and a portion of the proceeds of the sale was to be distributed to Empire after payment of various debts. Taking into account the apparent value of the 39-story building owned by Venture, Jupiter was in a position to require payment of the note at any time it chose to do so. In a very real sense, the obligation was a demand note.

---

[2] As stated in our Findings, respondent has conceded that the June 2, 1966, payment of $274,275 reduced Empire's taxable income from the transaction in 1966 to a maximum of $225,725

Furthermore, the parties have treated the revenue note as a valid obligation ever since it was signed. At the time the note was executed, Empire paid Jupiter $274,275 on the note, leaving a balance of $225,725. Subsequent payments (after the close of the taxable year in controversy) have been made thereon, reducing the principal balance to $92,420.71, as of July 1972. In addition, payments of interest had been made as of that date in the total amount of $26,445.71.

The mere fact that Empire agreed with Jupiter to alterations in the terms of its interest in Venture at or about the time Empire received the $500,000 does not change the character of the transaction. As a practical matter, borrowers frequently make concessions in order to obtain loans. For example, a bank may require as a condition to a loan that the borrower maintain a minimum checking account balance, alter its employee salary structure, or change its dividend policy. Such requirements may be important to both parties, but they do not alter the character of the loan transaction.

We hold the $500,000 was a loan rather than taxable income and that the note, though payable from a designated source, was a valid obligation. Cf. *Ernest A. Wilson*, 51 T.C. 723 (1969); *Harold Arlen*, 48 T.C. 640 (1967); *Manuel D. Mayerson*, 47 T.C. 340 (1966); *Jamison* v. *United States*, 297 F. Supp. 221 (N.D. Cal. 1968), affirmed per curiam 445 F. 2d 1397 (C.A. 9, 1971).

Respondent makes an alternative argument that, if the $500,000 was not ordinary income, it was a partnership distribution from Venture to Empire, taxable as capital gain under sections 702(a)(1) and 731.[3] The notice of deficiency does not refer to this item as a "distribution" and respondent concedes that the pleadings do not allege that the item should be so treated. Therefore, this alternative argument is not properly before us. We note, however, that since the notice of

---

[3] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.
SEC. 702. INCOME AND CREDITS OF PARTNER.
  (a) GENERAL RULE.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—
    (1) gains and losses from sales or exchanges of capital assets held for not more than 6 months,
SEC. 731. EXTENT OF RECOGNITION OF GAIN OR LOSS ON DISTRIBUTION.
  (a) PARTNERS.—In the case of a distribution by a partnership to a partner—
    (1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution, * * *

  *       *       *       *       *       *       *

Any gain * * * recognized under this subsection shall be considered as gain * * * from the sale or exchange of the partnership interest of the distributee partner.

  *       *       *       *       *       *       *

  (c) EXCEPTIONS.—This section shall not apply to the extent otherwise provided by section 736 (relating to payments to a retiring partner or a deceased partner's successor in interest) and section 751 (relating to unrealized receivables and inventory items).

deficiency contains no foundation for the alternative argument, the burden of proving that the "distribution" exceeded Empire's adjusted basis of its partnership interest in Venture immediately before the distribution—a prerequisite to the realization of any taxable capital gain under section 731(a)(1)—would rest with respondent. He has offered no such proof.

### Issue 2. The $274,275 Distribution

In the notice of deficiency, quoted in pertinent part in our Findings, respondent expressly determined that the "distributions" from Venture in the amount of $274,275 were taxable as ordinary income. Alternatively, respondent argues on brief that, if this amount is not taxable as ordinary income, it should be taxed as capital gain under section 731.

Respondent's position that the $274,275 should be taxed as ordinary income is a bit perplexing. Section 731 prescribes the general rule that, if money is distributed by a partnership to a partner, gain will be recognized to the extent the distribution exceeds the partner's adjusted basis of his partnership interest. Such gain is considered as gain from the sale or exchange of the partnership interest, and section 741 [4] provides that the gain or loss from the sale of a partnership interest is considered as gain or loss from the sale or exchange of a capital asset. The only exceptions to this rule are contained in section 731(c) which provides that section 731—

shall not apply to the extent otherwise provided by section 736 (relating to payments to a retiring partner or a deceased partner's successor in interest) and section 751 (relating to unrealized receivables and inventory items).

While respondent acknowledges that section 731 is applicable in determining whether petitioner recognized gain from the distribution and, if so, the character of that gain, respondent has not argued that either section 736 or section 751 applies. Rather, he contends that Empire received the $274,275 as payment for its consent to allow Associates and Wilkow Associates to enter the partnership. There is simply no basis in section 731 for taxing this distribution as ordinary income. See *Estate of Dupree* v. *United States*, 391 F. 2d 753, 757–758 (C.A. 5, 1968); cf. *Andrew O. Stilwell*, 46 T.C. 247, 250–251 (1966).

---

[4] SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.

In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value).

## Issue 3. Capital Gain From the $274,275 Distribution

Respondent's remaining argument is that, to the extent the $274,275 distribution exceeded Empire's basis of its partnership interest in Venture, Empire recognized capital gain under the provisions of section 731(a)(1). While respondent admits that Empire is entitled to increase its basis by an amount ($787,500) equal to 22½ percent of the $3,500,000 in loans Venture received from Associates and Wilkow Associates (sec. 1.752–1(e), Income Tax Regs.),[5] he asserts that after making this adjustment, Empire's basis was only $190,238. He contends that Empire's capital account, described in our Findings, shows that "immediately prior to the transaction of June 2, 1966," Empire had a "negative basis" of $597,262 in its partnership interest in Venture. He asks us, in computing Empire's adjusted basis, to subtract that negative figure of $597,262 from $787,500, Empire's proportionate share of the loans by Associates and Wilkow Associates to Venture, and arrive at an adjusted basis of $190,238. On this ground, respondent maintains that the difference between the distribution of $274,275 and the adjusted basis figure of $190,238 was taxable as capital gain under section 731.

Section 705(a)[6] provides for the computation of the adjusted basis of a partner's interest in a partnership by beginning with his contributions to the partnership (sec. 722) or the basis of transferred interests (sec. 742). Such basis is then increased by any further con-

---

[5] Sec. 1.752–1 Treatment of certain liabilities.

(e) *Partner's share of partnership liabilities.* A partner's share of partnership liabilities shall be determined in accordance with his ratio for sharing losses under the partnership agreement. In the case of a limited partnership, a limited partner's share of partnership liabilities shall not exceed the difference between his actual contribution credited to him by the partnership and the total contribution which he is obligated to make under the limited partnership agreement. However, where none of the partners have any personal liability with respect to a partnership liability (as in the case of a mortgage on real estate acquired by the partnership without the assumption by the partnership or any of the partners of any liability on the mortgage), then all partners, including limited partners, shall be considered as sharing such liability under section 752(c) in the same proportion as they share the profits. * * *

[6] SEC. 705. DETERMINATION OF BASIS OF PARTNER'S INTEREST.

(a) GENERAL RULE.—The adjusted basis of a partner's interest in a partnership shall, except as provided in subsection (b), be the basis of such interest determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests)—

(1) increased by the sum of his distributive share for the taxable year and prior taxable years of—

(A) taxable income of the partnership as determined under section 703(a),

(B) income of the partnership exempt from tax under this title, and

(C) the excess of the deductions for depletion over the basis of the property subject to depletion ; and

(2) decreased (but not below zero) by distributions by the partnership as provided in section 733 and by the sum of his distributive share for the taxable year and prior taxable years of—

(A) losses of the partnership, and

(B) expenditures of the partnership not deductible in computing its taxable income and not properly chargeable to capital account.

tributions by the partner and by his distributive share of the partnership's taxable income, tax-exempt receipts, and the excess of the deductions for depletion over the basis of the property subject to depletion. The partner's basis is decreased, *but not below zero*, by certain partnership distributions and by his distributive share of its losses and nondeductible expenditures which are not capital expenditures. The regulations (sec. 1.705–1(a)(1), Income Tax Regs.) amplifying section 705(a) declare specifically that: "The adjusted basis of a partner's interest in a partnership is determined without regard to any amount shown in the partnership books as the partner's 'capital', 'equity', or similar account."

We think it apparent, therefore, that respondent errs in contending that the computation of Empire's adjusted basis of its partnership interest in Venture must begin with the negative capital account figure of $597,262. While the evidence does not clearly show whether Empire had any remaining basis attributable to liabilities incurred to construct the 39-story building,[7] section 705(a)(2) precludes the use of a beginning figure less than zero. And if the computation is begun with zero, the addition to basis attributable to the Associates and Wilkow Associates loans exceeds the $274,275 distribution of June 2, 1966.

To reflect the settlement of other issues,

*Decision will be entered under Rule 155.*

---

[7] As reflected in our Findings, Empire's basis of its partnership interest in Venture may include a proportionate part of the $20 million apparently obtained by Venture to build the 39-story building, but the record is not clear as to the amount and terms of the loan actually obtained or the balance due thereon immediately before the June 2, 1966, distribution. Petitioner urges us to infer from the facts of record that Empire's adjusted basis includes a sufficient amount of that loan to exceed the $274,275 in dispute. We chose to rest our conclusion on the facts relating to the loans by Associates and Wilkow Associates. We note, however, that respondent has allowed Empire to deduct its distributive share of Venture's losses for 1966 and prior years. If Empire had no remaining adjusted basis in its partnership interest in Venture, these deductions would not have been allowable under sec. 704(d).