COVIL INSULATION CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7369-72.    Filed November 20, 1975.

*James R. Gilreath* and *Robert A. Dobson, Jr.,* for the petitioner.

*Edward P. Phillips,* for the respondent.

366

OPINION

Section 1501[4] permits an affiliated group of corporations to file a consolidated income tax return, in lieu of separate returns, for each taxable year. In granting this privilege, Congress did not attempt to prescribe detailed rules governing the determination of the income tax liability of members of the affiliated group. Rather, section 1502[5] authorizes the Secretary or his delegate to prescribe such regulations as he may deem necessary in order to clearly reflect the affiliated group's income tax liability.

Under the prescribed regulations, the current earnings or losses of each member of the consolidated group enter into the computation of consolidated income, section 1.1502-11, Income Tax Regs. The losses of one affiliate may offset the profits of another and thus serve to reduce or eliminate consolidated income. Losses of a subsidiary may be utilized in this matter without limitation, even if the amount of utilized losses exceeds the group's basis in the affiliate's stock. As a result, the group's tax liability may be distorted since the tax losses may exceed the economic losses. This distortion is eliminated, however, through the vehicle of compensating adjustments to the group's basis in the affiliate's stock.

Section 1.1502-32, Income Tax Regs., entitled "Investment adjustment," and section 1.1502-19, Income Tax Regs., entitled "Excess losses," deal with this problem. Under section 1.1502-

---

[4] SEC. 1501. PRIVILEGE TO FILE CONSOLIDATED RETURNS.

An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such consent. In the case of a corporation which is a member of the affiliated group for a fractional part of the year, the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group.

[5] SEC. 1502. REGULATIONS.

The Secretary or his delegate shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

32,[6] Income Tax Regs., the impact of the subsidiary's losses (and gains) is reflected in annual adjustments to the group's basis in the subsidiary's stock. The adjustments are of two kinds— positive and negative. Generally, the subsidiary's undistributed earnings and profits, which contribute to consolidated income, necessitate a positive adjustment which increases the group's basis in the stock. Losses of the subsidiary used to reduce the group's consolidated income require negative adjustments which decrease the group's basis in that stock. The adjustments are netted at the end of each taxable year. If the net negative adjustments exceed the group's basis in the stock, an "excess loss account"—a negative basis for the stock—results. Sec. 1.1502-32(e)(1),[7] Income Tax Regs.

When all of the subsidiary's stock is disposed of, the members of the affiliated group owning the stock are required to include the balance of the "excess loss account" in income. See sec.

---

[6] Sec. 1.1502-32 Investment adjustment.

(a) *In general.* As of the end of each consolidated return year, each member owning stock in a subsidiary shall adjust the basis of such stock in the manner prescribed in this section. * * *

(b). *Stock which is not limited and preferred as to dividends.*—(1) *Positive adjustment.* The positive adjustment with respect to a share of stock which is not limited and preferred as to dividends shall be the sum of—

(i) An allocable part of the undistributed earnings and profits of the subsidiary for the taxable year;

(ii) An allocable part of the portion of any consolidated net operating loss or consolidated net capital loss for the taxable year which is attributable to such subsidiary under section 1.1502-79(a)(3) or (b)(2), and which is not carried back and absorbed in a prior taxable year; * * * * * *

(2) *Negative adjustment.* The negative adjustment with respect to a share of stock which is not limited and preferred as to dividends shall be the sum of—

(i) An allocable part of the deficit in earnings and profits of the subsidiary for the taxable year (determined under section 1.1502-33);

(ii) An allocable part of any net operating loss or net capital loss incurred by the subsidiary in a prior separate return year, and of any portion of a consolidated net operating loss or consolidated net capital loss incurred by the group in a prior consolidated return year which is attributable to such subsidiary under section 1.1502-79(a)(3) or (b)(2), and which is carried over and absorbed in the taxable year;

(iii) Distributions made by the subsidiary during the taxable year with respect to such share out of earnings and profits of the subsidiary—

(a) Accumulated in prior consolidated return years beginning after December 31, 1965; or

(b) Accumulated in preaffiliation years of the subsidiary; * * *

[7] Sec. 1.1502-32(e)(1), Income Tax Regs., provides as follows:

(e) *Application of adjustment.*—(1) *Net negative adjustment.* A member owning stock in a subsidiary shall apply its net negative adjustment to reduce its basis for such stock. Any excess of such adjustment over basis is herein referred to as such member's "excess loss account."

1.1502-19(a)(1),[8] Income Tax Regs. The income, in most cases, is taxable as gain from the sale or exchange of stock. However, where, as in the instant case, the subsidiary is insolvent, the income is treated as ordinary income. Sec. 1.1502-19(a)(2),[9] Income Tax Regs.

The term "disposed of" or "disposition" is given a rather broad meaning. Sec. 1.1502-19(b)(2),[10] Income Tax Regs. With exceptions not here relevant, a member is considered to have disposed of all its shares in the subsidiary on the last day of its

---

[8] Sec. 1.1502-19 Excess losses.

(a) *Recognition of income.*—(1) *In general.* Immediately before the disposition (as defined in paragraph (b) of this section) of stock of a subsidiary, there shall be included in the income of each member disposing of such stock that member's excess loss account (determined under sections 1.1502-14 and 1.1502-32) with respect to the stock disposed of.

[9] Sec. 1.1502-19(a)(2), Income Tax Regs., provides as follows:

(2) *Character of income.*—(i) *In general.* Except to the extent otherwise provided in this subparagraph, the amount included in income under subparagraph (1) of this paragraph shall be treated as gain from the sale of stock (that is, as capital gain or ordinary income, as the case may be).

(ii) *Insolvency.* If, at the time of the disposition of stock of a subsidiary, the subsidiary is insolvent, then the amount included in income under subparagraph (1) of this paragraph, minus all amounts which increased the excess loss account under section 1.1502-14(a)(2) for any consolidated return year, shall be treated as ordinary income to the extent of such insolvency. For purposes of the preceding sentence, a subsidiary is insolvent to the extent that the sum of—

(a) All its liabilities,

(b) All its liabilities which were discharged during consolidated return years to the extent such discharge would have resulted in "cancellation of indebtedness income" but for the insolvency of such subsidiary, and

(c) The amount to which all stock of such subsidiary which is limited and preferred as to dividends is entitled in liquidation,

exceeds the fair market value of such subsidiary's assets. This subdivision shall not apply to the extent that the taxpayer establishes to the satisfaction of the Commissioner that the ordinary income portion of the excess loss account is attributable to losses of the subsidiary which reduced long-term capital gains of the group (without regard to section 1201).

[10] Sec. 1.1502-19(b)(2), Income Tax Regs., provides as follows:

(2) *Disposition of all shares.* Except as otherwise provided in paragraphs (d) and (e) of this section, a member shall be considered for purposes of this section as having disposed of all of its shares of stock in a subsidiary—

(i) On the day such subsidiary ceases to be a member,

(ii) On the day such member ceases to be a member,

(iii) On the last day of each taxable year of such subsidiary in which any of its stock is wholly worthless (within the meaning of section 165(g)), or in which an indebtedness of the subsidiary is discharged if such discharge would have resulted in "cancellation of indebtedness income" but for the insolvency of the subsidiary,

(iv) On the last day of each taxable year of the subsidiary for which the Commissioner is satisfied that 10 percent or less of the face amount of any obligation for which the subsidiary is personally liable (primarily or secondarily) is recoverable at maturity by its creditors,

(v) On the day on which a member transfers an obligation for which the subsidiary is personally liable (primarily or secondarily) to any nonmember for an amount which is 25 percent or less of the face amount of such obligation, or

(vi) On the last day of the taxable year preceding the first taxable year for which the group does not file a consolidated return.

taxable year in which, among other situations, the subsidiary's stock is wholly worthless or in which 10 percent or less of the face amount of any obligation for which the subsidiary is liable is recoverable at maturity by its creditors.

The group is thus able to reduce its consolidated income by loss deductions which are in excess of its true economic losses. It may be that these losses are temporary and the subsidiary will create enough earnings and profits later to eliminate the excess loss account. See Peel, Consolidated Tax Returns 227-228 (2d ed. 1973). If, however, the stock is disposed of prior to the subsidiary's economic turnaround, the utilized excess losses are the practical equivalent of an "amount realized" in excess of the group's investment and are logically includable in consolidated income. Sec. 1.1502-19(a), Income Tax Regs.

### 1. The 1968 Consolidated Income

Petitioner concedes that its Imesco stock was worthless in 1968, that Imesco could not pay its debts at the end of that year, that Imesco was insolvent within the meaning of applicable regulations, and that these regulations, if valid, would require the excess loss account of $118,661.01 to be included in the consolidated income for 1968. But petitioner contends that section 1.1502-32(e), Income Tax Regs., requiring a parent corporation filing a consolidated return to reduce its basis in its subsidiary's stock to a figure below zero is invalid. Petitioner also challenges the validity of section 1.1502-19(a), Income Tax Regs., requiring the parent to include in income the amount of the excess loss account upon a disposition of the subsidiary's stock.

In weighing petitioner's attack on these consolidated return regulations, we begin with the principle that the Income Tax Regulations "should not be overruled except for weighty reasons." *Commissioner v. South Texas Co.,* 333 U.S. 496, 501 (1948). Moreover, section 1502 expressly authorizes the issuance of regulations in this area to deal with the complex problems created by the filing of consolidated returns, thus providing an added reason for upholding such a regulation unless it is clearly contrary to the will of Congress. *Commissioner v. South Texas Co., supra* at 503; *Regal, Inc.,* 53 T.C. 261, 263-264 (1969), affd. per curiam 435 F.2d 922 (2d Cir. 1970); *Union Electric Co. of Missouri v. United States,* 158 Ct. Cl. 479, 486, 305 F.2d 850, 854 (1962).

Further, exercise of the privilege of filing consolidated returns required petitioner to "consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return." Sec. 1501; *Ilfeld Co. v. Hernandez,* 292 U.S. 62 (1934). As emphasized by petitioner, this consent does not preclude a challenge to arbitrary regulations. See *Joseph Weidenhoff, Inc.,* 32 T.C. 1222, 1242 (1959). However, when petitioner filed its first consolidated return in 1967, it was no doubt aware that the regulations permitted it to utilize Imesco's losses to offset its income even if those losses exceeded its basis in the Imesco stock and that the same regulations, in clearly defined circumstances, provide for a recapture of such excess deductions. The burden of the excess loss account provisions must be accepted with the benefit of unlimited access to the subsidiary's losses. See *Georgia-Pacific Corp.,* 63 T.C. 790, 802 (1975).

We think the challenged regulations reflect a permissible exercise of the rulemaking power granted by section 1502. Indeed, the facts of this case amply demonstrate their reasonableness. Petitioner's investment in Imesco was only $45,005, comprised of the $5 paid to acquire Imesco's stock and the $45,000 indebtedness which petitioner capitalized. Yet Imesco's losses, allowed as deductions in computing the tax results of the consolidated group, far exceeded that investment. They are as follows:

| | |
|---|---|
| 1967 loss offset against Covil's income | [1]$83,022.39. |
| 1968 loss carried back to 1965[2] | 25,705.34 |
| 1968 loss carried back to 1967 | 54,938.28 |
| Total allowed losses | 163,666.01 |
| Less: Petitioner's investment in Imesco's stock | 45,005.00 |
| Excess of deductions over petitioner's investment in Imesco's stock | 118,661.01 |

---

[1] See N. 2 (of the text), *supra,* regarding a nondeductible item of $721.33 included in this figure.

[2] Included in the computation of Covil's loss of $79,309.39 for 1968, as detailed in our Findings, is a bad debt loss of $175,418.42 for worthless accounts receivable owed by Imesco to petitioner. See sec. 1.1502-14(d)(1) and (3), Income Tax Regs.

The disputed regulations require this difference of $118,661.01 to be included in petitioner's income for 1968. In so providing, the regulations merely bring the tax results in line with the economic results of petitioner's ownership of Imesco's stock. The

regulation might have been drafted to limit the deductible losses to petitioner's basis in Imesco's stock, but such a regulation would be unnecessarily cumbersome where the loss situation is expected to be temporary. See Peel, *supra* at 227-228. We cannot say that the excess loss account provisions of the regulations are not a permissible alternative technique for limiting the tax deduction to the amount of the group's economic loss.[11] *Georgia-Pacific Corp., supra* at 801-802.

Petitioner attacks the regulation on the ground that its negative basis adjustment provisions are inconsistent with other Code provisions and the "common law" of taxation which denies that property can have a negative basis. See *American Water Works Co. v. Commissioner,* 243 F.2d 550 (2d Cir. 1957).[12] It is true that sections 705(a) and 733 provide that the basis of a partner's interest may not be reduced below zero, see *Milton Falkoff,* 62 T.C. 200, 208-209 (1974). It is also true that, under section 1376(b)(1) and (2), which provides for the passthrough of the losses of an electing small business corporation, a shareholder's adjusted basis in his stock may not be reduced below zero. Also, the basis adjustment provisions of sections 1011 through 1022 do not comtemplate bases below zero.

However, the law relating to consolidated returns is unique. It is designed to coordinate the details of treating several corporations as a tax unit. Among the unique features of consolidated returns is the allowance of deductions for a member's losses in amounts in excess of the group's basis in that member for computing consolidated income. Passthrough of losses in the case of a partnership or a small business corporation, in contrast, is specifically limited to the partners' or shareholders' basis in the

[11] In *United States v. Correll,* 389 U.S. 299, 306-307 (1967), the Supreme Court described its role of that and other courts, in weighing the validity of the Income Tax Regulations as follows:

"we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code. 26 U.S.C. section 7805(a). In this area of limitless factual variations, 'it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments.' * * * The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner."

[12] In *American Water Works Co. v. Commissioner,* 243 F. 2d 550 (2d Cir. 1957), the court stated that the then current consolidated return regulations did not provide for the adjustment of the basis of stock to a figure below zero. But the regulations applicable in that case did not contain the provisions of sec. 1.1502-32(e), Income Tax Regs., directing a negative basis.

business enterprise. Since such losses are so limited, reduction of the partners' or the shareholders' basis below zero is unnecessary to prevent tax deductions in excess of economic losses. The Supreme Court has recognized that a parent's basis for stock in a subsidiary is reduced for losses deducted in a consolidated return, *Ilfeld Co. v. Hernandez, supra,* an adjustment not described in any of the sections cited by petitioner. The disputed regulations merely codify this principle, and those regulations specifically preempt the field. Sec. 1.1502-80, Income Tax Regs.[13]

Nor do we find any merit in petitioner's contention that the definition of the term "disposition" or "disposed of," contained in section 1.1502-19(b)(2), Income Tax Regs., which triggers recapture of the excess loss account, leaves too much discretion to the Commissioner. The definition is detailed and is subject to explicit restrictions. True, the Commissioner's determination of the worthlessness of stock requires a factual finding, but so do many other Code provisions, such as a determination of "reasonable" compensation under section 162(a); a "reasonable" allowance for depreciation under section 167(a); when income is "clearly reflected" under section 446(b); and when a reallocation of income is required under section 482 to prevent the avoidance or evasion of a tax. Significantly, petitioner does not claim any abuse of the Commissioner's authority under the regulations in the instant case, but rather concedes that Imesco's stock was worthless in 1968.

Finally, petitioner challenges section 1.1502-19(a)(2)(ii), Income Tax Regs., which provides that, when the subsidiary is insolvent, the amount of the excess loss account is to be taxed as ordinary income rather than capital gain. However, when insolvency occurs, the corporation no longer has assets susceptible to application to its shareholders' claims. The economic loss generated by the insolvent subsidiary is borne by someone other than the shareholder, e.g., a creditor. When the group utilizes those losses, it receives a deduction against ordinary income, unrelated to its then extinct capital investment.[14] Therefore, the

---

[13] Sec. 1.1502-80 Applicability of other provisions of law.

The Code, or other law, shall be applicable to the group to the extent the regulations do not exclude its application. Thus, for example, in a transaction to which section 381(a) applies, the acquiring corporation will succeed to the tax attributes described in section 381(c). Furthermore, sections 269, 304, and 482 apply for any consolidated return year.

[14] If a parent corporation can demonstrate that the deducted losses reduced the long-term capital gains of the group, the ordinary income provision would not apply to that

excess loss account is justifiably converted to ordinary income, and the regulation is reasonable.

## 2. *The 1969 Carry-Forward*

Respondent relies upon sections 332 and 381 to deny petitioner's claim that it may carry over to 1969 the unused portion of Imesco's 1968 loss. In support of this argument, respondent maintains that Imesco was insolvent, was liquidated, and was dissolved de facto in 1968 and, consequently, ceased to be a member of the affiliated group in that year. Accordingly, to qualify in 1969 for the deduction of Imesco's unused 1968 losses under section 381(a)(1), petitioner must show that it was an acquiring corporation and that a distribution to which section 332 applies was made to it. However, since Imesco was insolvent in 1968, it had no property to distribute in cancellation or redemption of its stock within the meaning of section 332. See *Swiss Colony, Inc.,* 52 T.C. 25, 35 (1969), affd. 428 F.2d 49 (7th Cir. 1970). Accordingly, respondent maintains, petitioner is not entitled to succeed to Imesco's net operating loss carryovers. *Marwais Steel Co.,* 38 T.C. 633 (1962), affd. 354 F.2d 997 (9th Cir. 1965). Petitioner counters with the argument that, notwithstanding the facts recited in our Findings, Imesco was neither liquidated nor dissolved in 1968 but remained a member of the affiliated group.

We need not enter that thicket. We have sustained the consolidated return regulations relating to the recapture of the excess loss account, and application of those regulations would effectively offset the effect of the claimed carryover loss deduction. The balance in petitioner's excess loss account with respect to Imesco was zero as of December 31, 1968. When the affiliated group takes the deduction claimed for 1969, such deduction will require a negative adjustment to petitioner's basis in the Imesco stock, sec. 1.1502-32(b)(2)(ii), Income Tax Regs., thus creating an excess loss account equal to the deduction. Since the Imesco stock continued to be worthless in 1969, the excess loss account would be taken into income, thus offsetting exactly the amount of the allowed deduction.

---

portion of the losses. Sec. 1.1502-19(a)(2)(ii)(c), Income Tax Regs. Petitioner has made no such showing in the instant case.

### 3. *The Bad Debt Loss*

One final matter remains. As part of respondent's calculations of Imesco's excess loss account, it is necessary to determine the amount of Imesco's losses which were carried back to its year ending November 30, 1966. In granting Imesco's claim for refund for that year, based upon a carryback of its losses in 1968, respondent increased Imesco's taxable income by disallowing a bad debt deduction in the amount of $4,019.14. The alleged debt consisted of an account receivable from James L. Wynn and the book value of an automobile owned by Imesco and used by Wynn.[15]

Section 166(a)(1)[16] permits a deduction for debts which become wholly worthless during the taxable year. The burden of proof rests with petitioner. Other than unsupported allegations contained in petitioner's brief that the debt was uncollectible, there is no evidence regarding the existence or the worthlessness of the debt. Accordingly, we hold that petitioner has not sustained its burden of proof and respondent's determination must be sustained.

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[15] The facts relating to the portion of this debt attributable to the automobile are not clear. However, the burden of proof rests with petitioner, and no evidence was presented to support the deduction.

[16] SEC. 166. BAD DEBTS.

(a) GENERAL RULE.—

(1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.